MILLE LACS BAND OF CHIPPEWA IN-DIANS, Arthur Gahbow, Walter Sutton, Carleen Benjamin, and Joseph Dunkley, Plaintiffs,

United States of America,
Plaintiff–Intervenor,

St. Croix Chippewa Indians, et al., Lac Du Flambeau Band, et al., Bad River Band Of Lake Superior, et al., Lac Courte Oreilles Indians, et al., Sokaogan Chippewa Community, et al., Red Cliff Band of Lake Superior, et al., Plaintiffs–Intervenors,

v.

STATE OF MINNESOTA, Minnesota Department of Natural Resources, and Rod Sando, Commissioner of Natural Resources, Defendants,

Counties of Aitkin, Benton, et al., John W. Thompson, et al., Defendants–Intervenors,

Save Lake Mille Lacs Association, Amicus Curiae.

FOND DU LAC BAND OF CHIPPEWA INDIANS, et al. Plaintiffs,

v.

Arne CARLSON, et al., Defendants.

Nos. 3–94–1226, 5–92–159.

United States District Court,
D. Minnesota,
Third Division.

Jan. 29, 1997.

James M. Genia, Mille Lacs Band of Ojib-we, Onamia, MN, Marc D. Slonim and John

B. Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for Mille Lacs Band of Chippewa Indians, Arthur Gahbow, Walter Sutton, Carleen Benjamin and Joseph Dunkley.

James M. Johnson, Johnson Law Office, Olympia, WA, Jennifer Ann Fahey, Joint Powers Board, Milaca, MN, for County of Aitkin, County of Benton, County of Chisago, Sherburne County, Substituted for Chisago County, County of Crow Wing, County of Isanti, County of Kanabec, County of Mille Lacs, Morrison County, and County of Pine.

Larry Burton Leventhal, Leventhal Law Office, Minneapolis, MN, James M. Jannetta, Sault Ste Marie Tribe of Chippewas, Sault Ste Marie, MI, for Bad River Band of Lake Superior Chippewa Indians.

Milton Rosenberg, Rosenberg Law Office, Madison, WI, Donald R. McNeil, Jr., Bennett Brown, Minneapolis, MN, for Red Cliff Bank of Lake Superior Chippewa.

William Arthur Szotkowski, Stephen Bruce Masten, Jerilyn K. Aune, Michelle E. Beeman, Joseph Patrick Lally, Minnesota Attorney General, St. Paul, MN, for State of Minn., Minnesota Dept. of Natural Resources, Joseph Alexander, Com'r of Natural Resources, Arne Carlson, Governor of Minn., Rodney Sando, Com'r of Natural Resources and Raymond B. Hitchcock, Asst. Com'r of Operations.

Douglas B.L. Endreson, Ann Doris Noto, Sonosky, Chambers, Sachse & Endreson, Washington, DC, Henry M. Buffalo, Jr., Jacobson, Buffalo, Schoessler & Magnuson, Minneapolis, MN, Dennis J. Peterson, Fond du Lac Band of Lake Superior Chippewa, Cloquet, MN, for Fond du Lac Band of Chippewa, Robert Peacock, Peter DeFoe, Clifton Rabideaux, Herman Wise and George Dupuis.

Lawrence A.G. Moloney, Doherty, Rumble & Butler, Minneapolis, MN, for Save Lake Mille Lacs Association.

Gary E. Persian, Stephen G. Froehle, Persian MacGregor & Thompson, Minneapolis, MN, for John W. Thompson, Jenny Thompson, Joseph N. Karpen, Leroy Burling, Glenn E. Thompson, and Gary M. Kiedrowski.

George Cardinal, pro se.

Zenas Baer, Baer & Assoc., Hawley, MN, for Dale Hanks and Chief Hole in the Day VII, Individually, and on behalf of Mississippi Band of Chippewa Indians.

Robert Michael Small, U.S. Attorney's Office, Minneapolis, MN, William A. White, Sheila A. Hackett, U.S. Department of Justice, Indian Resources Section, Washington, DC, for U.S.

Kenneth E. Tilsen, Hamline Law School, St. Paul, MN, Howard J. Bichler, St. Croix Chippewa Law Office, St. Croix Chippewa Center, Hartel, WI, for St. Croix Chippewa Indians.

Steven T. Zobbi, Sokaogon Chippewa Community, Crandon, WI, Guy C. Charlton, Charlton Law Office, Milwaukee, WI, Marcia A. Cordes, Cordes Law Office, Minneapolis, MN, Kevin C. Potter, Brennan Steil Basting & MacDougall, Madison, WI, for Sokaogon Chippewa Community.

Carol Brown Biermeier, Brown Law Office, Sun Prairie, WI, for Lac Du Flambeau Band of Lake Superior Chippewa.

M. Joan Warren, Warren Law Office, Minneapolis, MN, for Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin.

Stephen G. Froehle, Persian, MacGregor & Thompson, Minneapolis, MN, for Amicus Proper Economic Resource Management Inc., for Amicus Minnesota Deer Hunters Association, for John Thompson, Jenny Thompson, Glenn Thompson, Joseph Karpen, Leroy Burling, and Gary Kiedrowski.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

### PROCEDURAL HISTORY

The Mille Lacs Band filed its Complaint on August 13, 1990 claiming the State has adopted and enforced natural resource laws and regulations that violate their privilege of hunting, fishing and gathering guaranteed them by the 1837 Treaty entered into between the United States of America and the Chippewa Indians. In this litigation, the Mille Lacs Band seeks a declaratory judg-

ment that the usufructuary rights granted under the 1837 Treaty continue to exist. The Mille Lacs Band also seeks a declaratory judgment defining the nature and scope of those rights and defining the permissible scope of state regulation upon their usufructuary privileges. Additionally, Mille Lacs seeks an injunction prohibiting enforcement of state fish and game laws against members of the Mille Lacs Band except as authorized in the Court's declaratory judgment.

The parties agreed to bifurcate the case into two phases. In Phase I, the issues to be determined involved whether the 1837 Treaty privileges continue to exist, whether the 1837 Treaty privilege extends to lands now, or previously, in private ownership, and the general nature of any rights guaranteed by the privilege. If the privilege was found to continue, Phase II of the case would address issues of resource allocation and the validity of particular measures affecting the exercise of the privilege.

Trial on Phase I commenced on June 13, 1994 and concluded on July 6, 1994. Based upon the testimony of fourteen witnesses, and over 400 exhibits, Judge Murphy issued her Findings of Fact, Conclusions of Law and Order, holding that the usufructuary rights granted the Mille Lacs Band pursuant to the 1837 Treaty continue to exist. *Mille Lacs Band of Chippewa Indians et al. v. State of Minnesota et al.*, 861 F.Supp. 784, 841 (D.Minn.1994) (*Mille Lacs II*). The general nature of this privilege was determined to be that the Indians understood they had given up their right to harvest timber, but that they did not understand the Treaty imposed any other limitations on the types of resources they could harvest, or that there were any restrictions on the time, place, or manner of the exercise of the privilege. *Mille Lacs II*, at 838. It was noted, however, that the validity of particular measures to regulate the taking or harvesting of resources, including resources taken for commercial purposes, was for Phase II. *Id.* Finally, it was held the 1837 Treaty privileges were not limited to the use of any particular techniques, methods, devices, or gear and whether specific techniques could be regulated for conservation or public health and safe-

ty again was reserved for Phase II. *Id.* The Court also delineated the legal standards for state regulation of hunting, fishing and gathering, while reserving the application of these standards to Phase II. *Id.*, at 838–39.

In September 1994, the Court entered a pretrial order for the Phase II portion of the case. Pursuant to that Order, the parties exchanged pre-trial statements. Plaintiff and Plaintiff-intervenor United States filed a joint statement identifying the state laws and regulations they believed violated the standards for state regulation set forth in the Court's Phase I decision. Attached to their joint statement was a proposed Band conservation code to regulate hunting, fishing and gathering by Band members in the Minnesota Ceded Territory. The State also filed a statement which identified the state laws or regulations it believes is applicable to the Bands and which also identified the State's concerns over the Band's proposed conservation code. Thereafter, a revised joint pre-trial statement was filed by the Mille Lacs Band and the United States and a revised Band conservation code submitted on behalf of the six Wisconsin Bands who were applying for intervention.

In March 1995, the Wisconsin Bands were allowed to intervene as plaintiffs in this case. Thereafter, the State, Counties and Landowners moved for summary judgment to limit the exercise of the Wisconsin Bands rights to exercise their privileges in the Minnesota Ceded Territory. This Court denied the motions and held that all Phase I determinations applied equally to the Wisconsin Bands.

Since the exchange of the pre-trial statements, the Mille Lacs Band, the Wisconsin Bands, and the State defendants held numerous meetings and exchanged a vast amount of information in an effort to narrow the issues raised in the pre-trial statements. The result of this effort is a Conservation Code and Commissioner's Orders to implement the Code prepared by the Bands. The Bands have also drawn up a Management Plan which includes a series of measures to govern their management of their members' hunting, fishing and gathering activities. The Bands and the State have agreed to a series of Protocols to coordinate harvest

management and resource assessment in the Minnesota Ceded Territory. Based on the Bands' Conservation Code, Commissioner's Orders, Management Plan and Protocols, the Bands and the State have identified specific state laws and regulations that do not, under the present circumstances, meet the standards for state regulation in the Court's Phase I decision, leaving a few specifically identified state laws and regulations as "Unresolved." The resolved and unresolved laws and regulations are identified in Exhibit E to a Stipulation entered into by the Mille Lacs Band, the Wisconsin Bands, the United States of America, and the State of Minnesota.[1] By this Stipulation, the executing parties agree, *inter alia,* that

1. Upon adoption of the Band Code, including authorization of State of Minnesota Department of Natural Resources personnel to enforce the provisions of such Code, issuance of the Commissioner's Orders and approval of the Management Plans and Protocols attached as Exhibits A, B, C, and D hereto by one or more of the plaintiff or plaintiff-intervenor Bands, and enforcement of the same, the application to such Bands and their members of the State statutes and regulations listed in Exhibit E hereto as "Resolved", to the extent set forth in Exhibit E, will not be necessary for conservation, public health or safety as those terms were used by the Court in its Phase I decision, and will therefore be unlawful. The only particular State statutes and regulations whose application to Band members remains in dispute in the current phase of this case are listed in Exhibit E as "Unresolved". The positions of the Stipulating Parties with respect to those statutes and regulations are indicated in the Comments column in Exhibit E. Those issues will be presented to the Court for resolution on summary judgment motion or at trial.

The Stipulating Parties also agreed that if a Band fails to adopt a conforming conservation code, attempts to rescind or otherwise nullify its code, or substantially fails to enforce provisions of its code, such Band members harvesting within the Minnesota Ceded Territory shall be subject to applicable state laws and regulations.

The Stipulating Parties also agreed that the following issues are not resolved by the Stipulation: 1) resource allocation issues; 2) which private lands may be available for Band harvest under their Conservation Code; 3) natural resource management decision making authority; and 4) whether the Bands may exercise their treaty rights throughout lakes that are only partially within the Minnesota Ceded Territory, and if not, how to determine the harvest available to the Bands in such lakes.

Before the Court are the motions of the parties for summary judgment on the Phase II issues which are in dispute.

*Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). To determine whether genuine issues of material fact exist, a court conducts a two-part inquiry. The court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow the fact finder to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

*I. Motions for summary judgment on Regulatory Issues*

By its motion, Plaintiffs and Plaintiff–Intervenors (hereinafter the "Bands") seek entry of an order which incorporates the terms of the Stipulations and resolves the remaining unresolved regulatory issues identified in the Stipulations. The State has filed

---

1. The Stipulation and attached Exhibits are on file with the Clerk of Court. A parallel Stipulation between the Fond du Lac Band and the State has also been filed with the Court.

cross motions for summary judgment on the following issues 1) the State's management authority; 2) prohibiting the Bands' exercise of its 1837 Treaty rights outside the Ceded Territory, including portions of lakes outside the Treaty boundary; and 3) the definition of private lands open to the public for hunting, fishing and gathering. The Counties have moved for summary judgment, seeking a declaration that the Court hold valid and applicable to all Band members, all Minnesota conservation laws. Finally, the Landowners have moved for summary judgment regarding the definition of private lands (Motion No. 6), management authority over natural resources (Motion No. 7), and legal standards for State regulation of Bands' exercise of its 1837 Treaty rights (Motion No. 8).

▉ Part of the relief sought by the Landowners is reconsideration of prior rulings. *See* The Landowners' Eighth Motion for Summary Judgment. The proper role of a motion to reconsider is extremely limited: "to correct manifest errors of law or to present newly discovered evidence." *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir.1988); *see also* Rule 59(e), Fed. R.Civ.P. Because the Landowners cannot establish a manifest error of law, and have not presented newly discovered evidence, any motions of the Landowners which seek a reconsideration of prior rulings are denied.

A. Order incorporating terms of Stipulations.

The Bands ask that the Court enter judgment on the regulatory issues incorporated in the terms of the Stipulations. The State agrees that an order incorporating the terms of the Stipulations is appropriate, but only in the Court's final order. Accordingly, if the Court resolves all remaining issues at the summary judgment stage, a final order will be entered and the State would not object to the Court including an order incorporating the terms of the Stipulations and a declaration that the statutes and regulations listed in Exhibit E thereto will not be applicable to the Bands or their members upon adoption of the referenced Code, Commissioner's Orders, Management Plans and Protocols. The State asserts, however, that if a trial is necessary to determine any issues, an order incorporating the terms of the Stipulations should not be entered until after trial. In response to this argument, the Bands have filed a motion for a preliminary injunction, asking the Court to allow the Bands to engage in interim harvests prior to the Court's final judgment. The motion for entry of a final order or a preliminary injunction shall be discussed later in this opinion.

The Bands and the State assert that the Counties and Landowners will likely object to a declaration which provides that the State statutes and regulations are not applicable to band members. The Bands and the State assert that such a declaration is nonetheless appropriate as 1) the burden is on the State to show that application of its laws is necessary for conservation, public health and safety, but such burden cannot be met as the State has stipulated such laws listed in Exhibit E are not necessary and 2) the Counties and Landowners must provide expert testimony to meet the standard, and they have not presented such testimony.

B. The "Unresolved" statutes and regulations.

As noted above, there are certain state statutes and regulations that are identified as "Unresolved" in Exhibit E to the Stipulations. They are as follows:

Minn.Stat. § 97A.045. The State argues it retains unilateral authority to determine harvestable surplus levels for both treaty and non-treaty harvests, and that its determinations are not subject to review by the Court.

Minn.Stat. § 97A.121 and Minnesota Rule 6242.0400. The State argues the Bands may not exercise their rights on private lands that are not open to the public and on which landowners consent to Band member hunting or fishing.

Minn.Stat. §§ 97B.081, 97B.311, Minnesota Rules 6232.0300 and .1300. It is the State's position that it is necessary for conservation purposes to prohibit hunting deer at night with the use of lights over bait in December.

Minn.Stat. §§ 97C.325, 97C.331 and Minnesota Rule 6262.0200. The State asserts that it is necessary to prohibit any use of gillnets in lakes that are under 1,000 acres.

### 1. Legal Standard

The legal standards that govern the State's regulation of treaty hunting, fishing and gathering were previously determined by the Court in *Mille Lacs II*.

> The legal standards for state regulation of Indian usufructuary rights are clearly established and will be relevant to Phase II issues. The State may regulate the exercise of the privilege in the interest of conservation "provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup Tribe v. Dept. of Game*, 391 U.S. 392, [88 S.Ct. 1725, 20 L.Ed.2d 689] (1968). To demonstrate that any regulation meets appropriate standards, the State "must demonstrate that its regulation is a reasonable and necessary conservation measure and that its application to the Indians is necessary in the interests of conservation ..."
> The State may also regulate the privilege to ensure public health and safety if the regulations do not discriminate against the Indian and are "reasonably necessary to prevent or ameliorate a substantial risk to the public health or safety." *Lac Courte Oreilles Band v. Wisconsin*, 668 F.Supp. [1233, 1241–42. (W.D.Wis.1987) ]. A public health and safety regulation is reasonable if it meets a three part test:
>> First, the State must demonstrate that there is a public health or safety need to regulate a particular resource in a particular area. This requires a showing by the state that a substantial detriment or hazard to public health or safety exists or is imminent. Second, the State must show that the particular regulation sought to be imposed is necessary to the prevention or amelioration of the public health or safety hazard. And third, the State must establish that application of the particular regulation to the tribes is necessary to effectuate the particular public health or safety interest. More-

> over, the State must show that its regulation is the least restrictive alternative available to accomplish its health and safety purposes. *Id.*, at 1239.
> The State may not impose its own regulations if the Band can effectively self-regulate and if tribal regulations are adequate to meet conservation, public health, and public safety needs....
> These clearly established legal standards should be applied to issues of state regulation, but the application of these standards to particular regulations and any allocation issues are reserved for Phase II.

*Mille Lacs II*, 861 F.Supp. at 838–839.

It is the Bands' position that the State carries the burden of establishing that a particular State regulation is reasonable and necessary for conservation, or public health and safety. If the State fails to submit affidavits showing a genuine issue of material fact exists regarding the necessity of a particular regulation, summary judgment should be entered in the Bands' favor.

### 2. Harvestable Surplus

In the State's motion for summary judgment on the State's Management Authority, the State asks the Court to provide by order that: 1) the State retains the responsibility and authority for the management of all resources of the State within the Ceded Territory, except as otherwise provided by this Court, and; 2) in the event of a dispute in determining the harvestable surplus level for any species that cannot be resolved by the State and the Bands, the determination shall be made by the Minnesota Department of Natural Resources ("DNR"). *See*, State's Proposed Order for Motion for Summary Judgment on the State's Management Authority.

As discussed above, the parties have made substantial progress in narrowing the issues left for Phase II of this litigation. As a result of this cooperative effort, the Bands and the State have agreed to a series of Protocols in an effort to coordinate harvest management and resource assessment in the Minnesota Ceded Territory. Protocol # 5 addresses Natural Resource Management in the Minnesota Portion of the 1837 Ceded

Territory. Section III of this Protocol addresses Harvestable Surplus and Harvest Management Units.

■ "Harvestable surplus" is a term that refers to the number or amount of any given species that may safely be taken by hunters or fishers. The harvestable surplus is the total amount of an available species to be divided between the Band harvesters and non-Band harvesters according to the applicable allocation amount. Section III of Protocol #5 recognizes that the State has developed and utilized methodologies for calculating the harvestable surplus of bear, anterless deer, wild turkey and registered furbearers and that the State wishes to continue using such methodologies and harvest management units for determining the harvestable surplus. The Bands recognize that they do not now have the information or experience to contest the State's methodologies or harvest management units for calculating harvestable surpluses for the named species. Therefore, the Bands have agreed to limit treaty harvests by adopting harvest quotas within each of the State's harvest management units, and will not object to the continued use of the State's methodologies for calculating harvestable surplus determinations. To better educate the Bands, the State has agreed to fully involve the Bands' technical representatives in the annual calculations of harvestable surplus determinations.

Protocol #5 also provides that in the event a dispute arises as to harvestable surplus determinations, either party has the option of invoking the mediation process provided in Protocol #1, or the continuing jurisdiction of the court, "unless the court has determined that one party has the authority to resolve the matter unilaterally and that its decision cannot be challenged in court." Protocol #5, at 2. In a footnote, it is revealed that the State contends it has the authority to resolve disputes over harvestable surplus determinations unilaterally, and that its decision is not reviewable by the Court. Protocol #5, at 2, n. 1.

The State asserts that harvestable surplus determinations are highly technical in nature, and, by definition, are conservation based. The determination involves gathering and analyzing data on many species, harvest patterns, gear, habitat and climate changes, as well as other factors that impact how much fish or game is available. Sophisticated mathematical and biological models have been developed over the years to translate data into specific harvest levels. The State is concerned that different biologists may have different opinions about the mechanics of the calculations, and at some point a decision will have to be made on which harvestable surplus level should be utilized. The State argues that it should be the one making such a decision, and that the courts should not second-guess competing scientific analyses. The State asserts that if the Bands believe the State's decision is based on some motivation other than good science based on legitimate conservation needs, they may ask for Court review. If the Court believes, however, that the State reached a harvestable surplus determination based on the appropriate conservation necessity, the Court should then defer to the State's biologist. The State asserts that that is the approach adopted by the Court in *Lac Courte Oreilles Band of Chippewa Indians v. Wisconsin,* 707 F.Supp. 1034 (W.D.Wis.1989) (*LCO VI* ).

In response, the Bands assert Minn.Stat. § 97A.045 [2] provides broad authority to the DNR, including a directive "to make special

2. Minn.Stat. § 97A.045, Subd. 1 provides:
   The commissioner shall do all things the commissioner determines are necessary to preserve, protect, and propagate desirable species of wild animals. The commissioner shall make special provisions for the management of fish and wildlife to insure recreational opportunities for anglers and hunters. The commissioner shall acquire wild animals for breeding or stocking and may dispose of or destroy undesirable or predatory wild animals.

   Subdivision 2 confers upon the commissioner the power to protect a species of wild animal, in addition to any protection provided by the game and fish laws, by limiting or closing seasons or areas of the State or by reducing limits if the commissioner believes such action is necessary to prevent unnecessary depletion or extinction or to promote the propagation and reproduction of a species.

provisions for the management of fish and wildlife to ensure recreational opportunities for anglers and hunters." It does not, however, specifically provide the State with unreviewable authority as to harvestable surplus levels.

The Bands assert that the determination of the harvestable surplus levels for a specific species will directly constrain Band harvests, as the harvestable surplus, in effect, determines the size of the Bands' harvest. Therefore, harvestable surplus determinations regulate Band harvest more directly than bag limits, gear restrictions or other types of harvest regulation. The Bands assert that the State's position, in effect, alters the clearly established legal principles that apply to a state's regulation of treaty rights. As set forth above, the burden is on the State to show its regulation is conservation based and is not discriminatory against the Indians' rights. But if the Court adopts the State's argument, the burden would be shifted to the Bands to show the regulation is not conservation based and/or is discriminatory.

The Bands also argue that the State's motion as to its Management Authority is vague and ambiguous and that the declaratory relief sought by the State, with the exception of the harvestable surplus issue, would be inappropriate as there currently is no concrete dispute before the Court—the State asks for a declaration that it can make management decisions without specifying an issue currently in dispute. The State responds to this argument by asserting there is a concrete issue before the Court that needs resolution—that is the Bands' quest for co-management. The State has taken the position that the Bands are seeking co-equal jurisdiction to manage the resources of the State. The State argues the case law supports its position that it has final management authority, and that it need not have to be subjected to second-guessing and protracted court dispute by the Bands any time the Bands dispute a decision the State makes.

■■■■ The Court agrees with the position of the Bands that, with the limited exception of the harvestable surplus issue, the State's Motion for Summary Judgment on its Management Authority does not present an issue of "controversy" that is appropriate for judicial determination. Declaratory relief is appropriately applied to cases of actual controversy. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

> A 'controversy' in this sense must be one that is appropriate for judicial determination.... A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Id.* at 240–241, 57 S.Ct. at 464 (internal citations omitted). The decision to grant declaratory relief is left within the sound discretion of the court, even where there is a justiciable controversy. *United States v. State of Washington*, 759 F.2d 1353, 1356 (9th Cir.1985) *cert. denied*, 474 U.S. 994, 106 S.Ct. 407, 88 L.Ed.2d 358 (1985). Declaratory relief should always be made with reference to the public interest. *Id.*, at 1357. "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *Id.*

In *Washington*, the Ninth Circuit vacated the district court's grant of declaratory relief on what was designated by the district court as the environmental issue in the "protracted litigation over Indian fishing rights in the Pacific Northwest." *Id.*, at 1354–55. The district court had declared that "the right to take fish necessarily includes the right to have those fish protected from man-made despoliation, so that the treaties impose upon the State a corresponding duty to refrain from degrading or authorizing the degradation of the fish habitat to an extent that would deprive the treaty Indians of their moderate living needs." *Id.*, at 1355.

Finding the issuance of the declaratory relief on the environmental issue was contrary to sound judicial discretion, the court stated:

> The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon concrete facts which underlie a dispute in a particular case. Legal rules of general applicability are announced when their consequences are known and understood in the case before the court, not when the subject parties and the court giving judgment are left to guess at their meaning. It serves neither the needs of the parties, nor the jurisprudence of the court, nor the interest of the public for the judiciary to employ the declaratory judgment procedure to announce legal rules imprecise in definition and uncertain in dimension. Precise resolution, not general admonition, is the function of declaratory relief.

*Id.*, at 1357.

With the exception of the harvestable surplus issue, there is no concrete issue before the Court with regard to the State's management authority. The State does not present specific facts or a specific dispute upon which to apply declaratory relief. Thus, if the State's motion was granted, the Court, as well as the parties, would have to guess at the meaning such a ruling would make.

The parties agree, however, that the harvestable surplus issue is a justiciable one. As noted above, the State is of the position that it retains final authority to make harvestable surplus determinations—that is if the State biologist and the Bands' biologist disagree as to the proper harvestable surplus level for a particular species, the State has the final say. The State agrees that the Bands can seek review of a regulation that it believes is not conservation based. However, the State asserts that when it makes a "conservation based" decision, such as harvestable surplus determinations, that decision is not subject to review by the Court. The Bands reply that any decision made by the State is subject to review, and the burden is on the State to prove a decision is "conservation based." By giving the State the relief it requests, the Bands argue the Court would be giving the State a blank check to make harvestable surplus determinations without basing such decisions, necessarily, on conservation needs. The State responds to this argument defensively, stating there is no basis upon which to be suspicious of the State's motives in reaching such harvestable surplus determinations.

The Court would first recognize that the State and the Bands have worked together commendably to reach agreement on a number of issues relevant to the Phase II portion of this case. The fact remains, however, that the Bands have been denied their right to exercise their usufructuary rights under the 1837 Treaty for a number of years. Their suspicion, therefore, is understandable.

The State principally relies upon the opinion in *Sohappy v. State of Oregon,* 302 F.Supp. 899 (D.C.Or.1969). At issue in *Sohappy* was the limitation on the state's power to regulate the exercise of the Indians' treaty rights. In *Sohappy,* the state of Oregon argued that it could place any restriction upon the Indians' fishing rights if the same restrictions were placed on non-Indian fishing. *Id.* at 907. The state argued the treaty gave the Indians no rights that were to be given separate recognition or protection or be separately dealt with in the state's regulatory scheme. *Id.* The court determined that the state's narrow interpretation of the Indians' rights under the treaty was not supported by law. *Id.* at 908.

Relying in large part on the opinions of the United States Supreme Court in *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) and *Tulee v. Washington,* 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), the court in *Sohappy* recognized that the state has the authority to regulate fishing by non-Indians to achieve a wide variety of management conservation objectives, but that as to regulating the "federal right of Indians to take fish at their usual and accustomed places it does not have the same latitude in prescribing the management objectives and the regulatory

means of achieving them." 302 F.Supp. at 908.

The state may not qualify the federal right by subordinating it to some other state objective or policy. It may use its police power only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource. The measure of the legal propriety of a regulation concerning the time and manner of exercising this 'federal right' is, therefore, 'distinct' from the federal constitutional standard concerning the scope of the police power of the State.

*Id.* The court further defined the parameters of the state's ability to regulate Indian fishing, by stating,

[i]t is clear that the state has the full and complete power to regulate all kinds of fishing, including the Indian fishery, to the end that the resource is preserved... In determining what is an 'appropriate' regulation one must consider the interests to be protected or objective to be served. In the case of regulations affecting Indian treaty fishing rights the protection of the treaty right to take fish at the Indians' usual and accustomed places must be an objective of the state's regulatory policy co-equal with the conservation of fish runs for other users.

*Id.* at 911. The court refused to prescribe in advance all the details of appropriate and permissible regulation, since "proper anadromous fishery management in a changing environment is not susceptible of rigid predetermination" *Id.* The court also refused, based on the record before it, to prescribe the procedures which the state must follow in adopting regulations applicable to the Indians.

The state must recognize that the federal right which the Indians have is distinct from the fishing rights of others over which the state has a broader latitude of regulatory control and that the tribal entities are interested parties to any regulation affecting the treaty fishing right. They, as well as their members to whom the regulations will be directly applicable, are entitled to be heard on the subject and,

consistent with the need for dealing with emergency or changing situations on short notice, to be given appropriate notice and opportunity to participate meaningfully in the rulemaking process.

*Id.* at 912. The court went on to state,

This does not mean that tribal consent is required for restrictions on the exercise of the treaty rights. As the Supreme Court has stated on several occasions, the state's police power gives it adequate authority to regulate the exercise of the treaty secured Indian off reservation fishing rights, provided its regulations meet the standards which that court has prescribed.

It is not necessary at this time, and it would be inappropriate on this record, to determine the extent, if any, of the authority of the Federal Government or of the intervenor tribes to prescribe regulations that would govern Indians in the exercise of the treaty-secured fishing rights. It is sufficient to say that the state's authority to prescribe restrictions within the limitations imposed by the treaties and directly binding on the Indians is not dependent upon assent of the tribes or of the Secretary of the Interior.

*Id.* It is the last two quoted paragraphs from the *Sohappy* opinion upon which the State relies in arguing that it retains final authority to make harvestable surplus determinations that are unreviewable by the Court. The Bands respond that they do not take the position that the State needs their consent, but rather argue that if the State imposes that determination upon the Bands, it must be necessary for conservation and can be challenged in court. Read in its proper context, the Court finds that *Sohappy* does not provide the State unreviewable authority to set harvestable surplus determinations.

The State also cites to *Puyallup Tribe,* in which the Court stated,

The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State ... But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation

meets appropriate standards and does not discriminate against the Indians.

*Puyallup Tribe*, 391 U.S. at 398, 88 S.Ct. at 1728. Thus, *Puyallup Tribe* does not stand for the proposition that the State enjoys unreviewable authority to set harvestable surplus determinations either. The State may regulate harvestable surplus levels, but such determinations should be reviewable in court to ensure such regulation meets the appropriate conservation standards.

Finally, the State argues that Judge Crabb in the *LCO* litigation ruled the state of Wisconsin has final authority to make management decisions. Before the court in *LCO VI*, *supra*, was the question of the extent, if any, to which the state of Wisconsin may regulate the bands' exercise of their usufructuary right to harvest walleye and muskellunge within the ceded territory. In making this determination, the court specifically relied on its prior ruling that the state could regulate the exercise of the bands' usufructuary rights only in the interest of conservation and public health and safety and only upon a showing that the regulation is reasonable and necessary for either conservation or health and safety and that it does not discriminate against the Indian harvest. *LCO VI*, 707 F.Supp. at 1037 (*citing, Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 668 F.Supp. 1233 (W.D.Wis.1988) (*LCO IV*)).

Before the court was a specific proposal for regulation by the state of Wisconsin as to the harvesting by the Bands of walleye and muskellunge. The court held that the state of Wisconsin could not regulate the Bands' harvesting of walleye and muskellunge provided the Bands "enact a management plan that provides for the regulation of their members in accordance with biologically sound principles necessary for the conservation of the species being harvested, as set out in this opinion." *LCO VI*, 707 F.Supp. at 1060. One such "biologically sound principle" involved the sharing of biological information between the Bands and the State. The need for the exchange of such information was explained by the court as follows:

> The fact that plaintiffs may be regulating their members' exercise of their treaty rights does not make them the manager of the fisheries. That responsibility and authority remains the defendants'. They have the fiduciary obligation of managing the natural resources within the ceded territory for the benefit of the current and future users.... The tribes' regulation of their members does not relieve the department of this obligation or prevent it from carrying it out, although it narrows its management options to a significant degree, and imposes burdens on them beyond those it carried out in the previous implementation of the *Voigt* decision.

*Id.* Another "biologically sound principle" involved the determination of a safe harvest level. On this issue, the court stated that such determination should be made on the basis of a reliable population estimate, to which is applied an agreed upon exploitation rate and then discounted by a safety factor that is to be determined by the Biological Issues Group (a State–Tribal group of biologists), or "if the group fails to reach agreement on that factor, to be provided by the Department of Natural Resources." *Id.* at 1059. The court does *not* go on to say that such determination by the Department of Natural Resources as to the applicable safety factor is not subject to judicial review. Read in context with its prior opinions, the court in *LCO VI* did not grant the state of Wisconsin the authority to make harvestable surplus determinations that are immune from judicial review.

In its motion for summary judgment on the harvestable surplus issue, the Bands ask the Court to enter an order requiring 1) the parties to attempt to reach consensus on harvestable surplus determinations, in accordance with the Protocols; and 2) if, after exhausting the non-judicial dispute resolution processes in the Protocols the parties cannot reach consensus on such matters, either party to ask the Court to resolve the disputes. Based on the above, the Court finds that the Bands' position as to harvestable surplus determinations, that such determinations are subject to judicial review, is consistent with the applicable case law. Summary judgment is therefore appropriate in favor of the Bands

on the issue of harvestable surplus determinations.

### 3. Boundary Lakes

The State asserts that the Minnesota portion of the Ceded Territory bisects twenty-two (22) lakes, the largest being Lake Mille Lacs. The State argues that the portions of the lakes outside the Ceded Territory is not available for the exercise of the rights granted in the 1837 Treaty. Accordingly, the State argues that the allocation formula for harvestable fish must recognize a proportional reduction to reflect the proportion of lakes excluded. The State argues its position is supported by the language of the 1837 Treaty, which provides the Bands "the privilege of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guaranteed to the Indians, during the pleasure of the President of the United States ..." Article 5, 1837 Treaty. The State also notes that in the Stipulations, the Bands have agreed that the harvestable surplus levels for wildlife shall be calculated for the portion of the harvest unit within the Ceded Territory on the basis of the percentage of the harvest unit's total acreage within the ceded territory, and that the State simply asks that the same be done for the lakes.[3]

The Bands respond that their treaty rights extend to all waters "in and abutting the ceded territory" as stated by the court in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F.Supp. 1420, 1426 (W.D.Wis.1987) (*LCO III*) and reaffirmed in *LCO VI*, 707 F.Supp. at 1037. The Bands argue the State has not submitted any authority for its argument, and that case law in fact is contrary to such position.

As previously held by this Court in *Mille Lacs II*, the first rule of construction applicable to the interpretation of Indian treaties requires the treaty language be construed as the Indians understood them, "not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Id.* at 822 (*quoting, Washington et al. v. Washington State Commercial Passen-*

*ger Fishing Vessel Ass'n*, 443 U.S. 658, 675–76, 99 S.Ct. 3055, 3069–70, 61 L.Ed.2d 823 (1979) (*Passenger Fishing Vessel*)). The second rule of construction requires that ambiguous terms be construed in favor of the Indians, "particularly if the language could easily be interpreted in favor of the Indians or the United States ..." *Id.* Together, the canons of construction applicable to the interpretation of Indian treaties requires "a liberal interpretation in favor of Indians." *Id.*

Applying these canons of construction to Article 5 of the 1837 Treaty, the Court finds that the Bands would not have understood that they could not fish on the portion of a boundary lake which lies outside of the Ceded Territory. As noted by the Michigan Supreme Court in *People v. Jondreau*, 384 Mich. 539, 185 N.W.2d 375, 378 (1971):

> The Indians did not have knowledge of the laws concerning municipal boundaries or sovereignty disputes between the Federal and State governments. Since they were living on land bordering the Keweenaw Bay, as 'an unlettered people' they would assume that the right to fish meant the right to fish on the Keweenaw Bay.

Similarly, with respect to the boundary lakes at issue here, the Chippewa would assume that they could fish on any portion of the lake, not just on part of the lake. The court in *LCO III* specifically found that this was the understanding of the Chippewa when they agreed to the treaties of 1837 and 1842. *LCO III*, 653 F.Supp. at 1426 (they understood they were guaranteed the right to make a moderate standard of living off the land and the waters in and abutting the ceded territory).

The treaty guarantees the right to fish "in the rivers and the lakes included in the territory ceded." On the issue as to whether the Ceded Territory includes only the portion of a boundary lake located inside the boundary or the whole lake, the treaty language is ambiguous. Arguably, the treaty language supports both positions. Applying the second canon of construction applicable to Indian treaties, ambiguities are to be construed in favor of the Indians. Thus, the Bands are

---

**3.** See also the Landowners' Fourth Motion for Summary Judgment.

free to exercise their rights on those parts of the boundary lakes which lie outside of the Ceded Territory.

Because the Court finds that the 1837 Treaty rights extend to waters "in and abutting" the Ceded Territory, there is no merit to the State's claim that the harvestable surplus calculations for boundary lakes must be reduced on the basis of the percentage of lake outside the Ceded Territory. Summary judgment in favor of the Bands is appropriate on this issue.

### 4. Private Lands

Both the State and the Bands seek a definition of "private lands" upon which the Bands can exercise their usufructuary rights under the 1837 Treaty.[4] The State argues that in *Mille Lacs II,* the Court's use of the phrase "private lands open to public hunting, fishing and gathering" restricted the exercise of treaty rights on private lands to those private lands opened to the general public for hunting, fishing and gathering by operation of state law, such as the Minnesota tree growth tax law which creates right of public access in exchange for granting favorable tax treatment to lands. The State argues that such definition does not include private lands to which the owner grants permission to hunt and fish to certain individuals or groups. The State asserts its position is consistent with the holdings in the *LCO* litigation and by prior orders of this Court.

The Bands argue that *Mille Lacs II* stands for the proposition that the 1837 Treaty did not provide a right of access, therefore the usufructuary rights cannot be exercised on land to which the Band members would not have access. However, by receiving the consent of a landowner, such Band member would be given access and could therefore exercise their rights on such land.

In *Mille Lacs II,* the Court noted that the Bands were not seeking access to private lands. 861 F.Supp. at 789. In a footnote, the Court added:

Plaintiffs concede that the 1837 Treaty did not provide any special right of access and that the rights they seek to have recog-

nized "may be exercised only on those lands and waters, public or private, to which Band members have access under generally applicable law." Joint Proposed Findings of Fact and Conclusions of Law at 92–93.

*Id.,* 789 n. 2. Later on in the opinion, Judge Murphy addressed the Landowner's argument that the usufructuary rights were terminated by land patents issued by the government. *Id.* at 835. The Court ruled that the issuance of land patents did not extinguish the usufructuary rights at issue, but nonetheless held that

exercise of the 1837 usufructuary rights should be limited to lands in the ceded territory that are not privately owned because no right of access was included in the privilege. In this sense, privately owned lands do not include public lands formerly in private ownership or private lands open to public hunting, fishing and gathering.

*Id.,* at 836 (*citing, LCO III,* 653 F.Supp. at 1432, *see infra,* pp. 834–835. *See also Kimball v. Callahan,* 493 F.2d 564, 566–69 (9th Cir.) *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974)). The meaning of the phrase "private lands open to public hunting, fishing and gathering", can be determined by examining the cases cited in support thereof.

■ Judge Murphy first cites to the *LCO* opinion of Judge Doyle, which states the following:

A specific definition of privately owned lands was not articulated by the court of appeals in *LCO I* [*Lac Courte Oreilles Band v. Voigt,* 700 F.2d 341 (7th Cir. 1983)] and *LCO II.* I declare the term to mean lands that are privately owned as of the time Chippewa exercise of usufructuary rights is contemplated or carried on. The lands are not "privately owned" if they were privately owned at some earlier time, but are no longer so owned. Also, if the owners of privately owned lands have made provision for hunting, fishing and gathering by the public generally—rather than for such activity only by limited persons or groups specifically designated by

---

4. See also the Landowners' Sixth Motion for Summary Judgment.

the owners—the Chippewa can exercise their usufructuary rights. *LCO III*, 653 F.Supp. at 1432. Judge Murphy then cites to the prior discussion in her opinion addressing the issue of whether the language used in the 1837 Treaty created a *profit a prendre* [5] that was an interest in land extinguished by the 1855 Treaty or a license extinguished by subsequent sale of land. In finding the usufructuary rights were neither a *profit a prendre* or a license, Judge Murphy relied on the expert testimony of Dr. Thomas Lund. *Mille Lacs II*, at 834. Dr. Lund had testified that the 1837 Treaty conveyed a privilege to hunt or fish if the takers could reach the land without committing a trespass. *Id.* Dr. Lund also testified that the drafters of the 1837 Treaty would not have considered the usufructuary privileges to be a right, title or interest in land. *Id.* Judge Murphy found that Dr. Lund's testimony was consistent with nineteenth century law. *Id.*

Judge Murphy then went on to discuss the American common law rule that the sovereign owns fish and game in trust for its citizens, and that a landowner can only convey the right to hunt and fish game on his/her land by granting the right to enter the land for that purpose. *Id.* Judge Murphy went on to note that as a sovereign, the United States could, however, convey its ability to regulate the taking of the wildlife it owns, and that the similar right was conveyed in the 1837 Treaty.

> In the nineteenth century the public was allowed to hunt, fish, and gather on all lands not developed, enclosed or posted. An abundant amount of land was open for these purposes, and the drafters of the 1837 Treaty would not have focused on whether the Chippewa would have access to land to hunt, fish, and gather. The 1837 Treaty does not mention access or entry. It seems unlikely that the United States would have given the Chippewa an implied right of access to the 1837 ceded territory because such right could have eventually

prevented certain uses of the ceded territory.

*Id.* Judge Murphy also determined that the evidence in the record did not support a finding that the Chippewa understood their usufructuary rights would be subject to automatic termination whenever a portion of the Ceded Territory was transferred by the federal government. *Id.*, at 835. "There is no evidence that the Chippewa understood that the usufructuary privilege would be terminated whenever land was surveyed and sold. They understood that it would only be terminated by the President in good faith." *Id.*

Finally, Judge Murphy cited the *Kimball* decision to support the determination that the usufructuary rights can only be exercised on private lands open to the public for hunting, fishing and gathering. In that case, the Ninth Circuit declared that plaintiffs could exercise their treaty rights to hunt and fish "on the lands constituting their ancestral Klamath Indian Reservation, including that land now constituting United States national forest land and that privately owned land on which hunting, trapping or fishing is permitted." *Kimball*, 493 F.2d at 570. The court also noted that the plaintiffs did not seek rights against private landowners, because they recognized those persons might properly exclude Klamaths and anyone else from hunting or fishing. *Id.* at 569. In a footnote, the court stated it was not making any determination as to the treaty rights of the Indians as against private landowners. *Id.* at 569 n. 10.

■ The Bands argue that read together, the above case law supports its position that "private lands open to public hunting, fishing, and gathering" includes private lands that are undeveloped, non-agricultural and non-posted lands, which, according to statute, are open to the public for hunting. Minn.Stat. § 97B.001 provides that any person may hunt on private land that is not agricultural land, Section 97B.001, Subd. 1, and that is not posted, Section 97B.001, Subd. 4, if such

---

**5.** *Profit a Prendre* is defined as a right exercised by one in the soil of another, accompanied with participation in the profits of the soil thereof. Blacks Law Dictionary, p. 1376. This right includes the conveyance of hunting and fishing rights by property owners and the right to enter land for that purpose. *Mille Lacs II*, at 834. *Profit a Prendre* is considered to be an interest in land.

person has not been notified orally that they may not enter the land by the owner, occupant or lessee of the private land. Section 97B.001, Subd. 3. The case law does support this position, to a certain extent. Pursuant to Section 97B.001, any member of the public, Indian and non-Indian, may enter non-agricultural and non-posted land for the purpose of hunting. However, the owner, occupant or lessee of such private land could conceivably discriminate against the Indians or the non-Indians by giving oral notice that such persons cannot enter the land to hunt. The State asserts the distinction between private lands open to the public generally and indiscriminately and private lands to which owner consent is necessary is crucial. Private lands open to the public generally carry a statutory right of access, while private lands to which consent must be obtained carries no right of access for the general public. The State also asserts that the *LCO* court and Judge Murphy held the right to exercise the usufructuary rights coexisted with a right of access protected by state law, not at the discretion of landowners.

Although not relied upon by Judge Murphy in making her determination as to which private lands may be utilized by the Bands to exercise their usufructuary rights, the specific issue of whether such rights could be exercised on private lands with owner consent was addressed in *Lac Courte Oreilles Band v. Wisconsin,* 740 F.Supp. 1400, 1420 (W.D.Wis.1990) (*LCO VII* ). The state of Wisconsin opposed the contention that the Band members could exercise their rights on private lands with owner consent, asserting the issue of consent is legally gratuitous:

> recognizing on one hand that if the treaty right extends to private lands it is unnecessary for the tribes to secure the consent of the owners, and on the other, that if plaintiffs' rights do not extend to private lands the tribes cannot relieve themselves of the obligation to obey state hunting regulations simply by reaching an agreement with a property owner to hunt on private lands.

*Id.* The court agreed with the position of the state of Wisconsin.

If plaintiffs have a right to hunt on private lands, they cannot be limited to hunting on only those private lands whose owners consent. Defendants are correct in maintaining that the issue of consent is a red herring: the issue is whether the plaintiffs may exercise their usufructuary rights on private lands within the ceded territory. In my view, that opportunity is foreclosed to plaintiffs at the present time. The decisions of the court of appeals in LCO I, 700 F.2d 341 and LCO II, 760 F.2d 177, have established that plaintiffs' rights have been extinguished on private lands. I have held that plaintiffs are not entitled to all of the resources necessary to provide them with a moderate standard of living. Plaintiffs are entitled to an equal share of all of the resources within the ceded territory, but they may harvest those resources only from public lands. It may be in the future that they can prove not only that they have the need to take the full half of the resources to which they are entitled but that they have the capacity as well and that they cannot harvest their share without gaining access to private lands. In that event it may be necessary to take appropriate measure for Chippewa activity on privately owned lands, as Judge Doyle suggested. It may be that hunting by consent is one of those measures. I express no view on that point.

*Id.*

After a careful analysis of all the cases cited by the parties on this issue, the Court finds that at this time, the better construction of which private lands are available for the exercise of the 1837 Treaty rights is that proposed by the State. Although the *LCO VII* decision of Judge Crabb is the only decision which specifically addresses the issue, the Court finds that the essence of the cases cited by the parties supports a finding that the treaty rights at issue in this litigation may only be exercised on lands, public or private, open to the general public for hunting, fishing and gathering by operation of state law.

As noted by the State, allowing the exercise of the usufructuary rights by owner consent would potentially provide individual

Band members more rights than other Band members. The rights granted under the 1837 Treaty are rights granted to the Bands, not to individual members. Furthermore, given the fact that a private landowner could discriminate as to who would be allowed to hunt, fish or gather on his/her land would create potential problems in law enforcement. A conservation officer would have the undue burden of having to contact private land owners to determine if consent was provided to certain individuals before being able to determine whether laws were violated.

It may be, as pointed out by Judges Doyle and Crabb in the *LCO* litigation, that it will be necessary at some point in the future to address this issue again if the Bands can show that they cannot harvest their share without gaining access to private lands. However, as the Bands have not, as yet, been able to exercise their usufructuary rights there is no evidence before the Court that they will not be able to harvest their share only on public lands.

Based on the above, summary judgment is appropriate for the State as to the definition of "private lands" upon which usufructuary rights may be exercised.

### 5. Shining Deer in December

The Bands have developed a comprehensive set of regulations to provide limited opportunity for band members to hunt deer at night with the aid of lights, over bait, from the day after Labor Day to December 31. Band Code Section 6.20. The State argues that Minn.Stat. §§ 97B.081, 97B.311 and related Minnesota Rules 6232.0300 and 6232.1300 should remain applicable to Band members arguing it is necessary for conservation to prohibit the shining of deer, over bait in December. The State argues that shining deer over bait is such an effective method of hunting and the Band members use of such method may thwart the State's careful management of deer through its harvest management unit system.

The State manages its deer resource through a system of designated harvest management units. This method is used because it takes into consideration different habitats, human development pressure, land ownership and use patterns and climate conditions. There are 121 anterless deer permit areas in the State, fifteen of which fall within the Minnesota Ceded Territory. The State distributes and records deer hunting tags by these units to allow for more control of hunting efforts in the different parts of the State. The State allows hunters to remove anterless deer within the permit units in numbers that correspond to the population management goals and harvestable surplus calculations for the particular permit unit. The State currently makes its calculations based on summer/fall distribution of deer.

The concern here is that during the winter months, deer begin to move and migrate seeking better shelter and/or accessible food sources. The winter migration may cause deer to move many miles, from one permit unit to another, or it may cause deer to concentrate in one spot within a unit. Once the deer have concentrated, the State is concerned that the use of the efficient harvest method of shining over bait could lead to deer being harvested in disproportionate numbers from what was predicted by the biologists, leading to potential over harvest of deer in certain parts of the Minnesota Ceded Territory.

The Bands first assert that the statutes and rules upon which the State relies to prohibit shining, over bait, in December are over broad. Minn.Stat. § 97B.081 prohibits all shining of deer. Minn.Stat. § 97B.311 merely vests authority in the State Commissioner to prescribe areas and seasons in which deer may be taken. Minn.Rule 6232.0300, Subpart 4 prohibits the use of bait and Minn.Rule 6232.1300 prescribes seasons for taking deer by firearms, the application of which would eliminate most of their firearms deer season. The State concedes that these statutes and rules would not be enforced beyond the extent of prohibiting the shining of deer over bait in December. Accordingly, the Bands are entitled, at a minimum, to a declaration of the Court that such statutes and regulations are inapplicable to Band members except when hunting deer with lights over bait in December.

The Bands argue they are nonetheless entitled to summary judgment as to deer shining over bait in December as the State has failed to show that such regulation of this harvest method is necessary for conservation, as that term is defined in the context of Indian Treaty rights.

■ Judge Murphy previously held that before the State can regulate the exercise of the usufructuary privileges the State must show that such "regulation is a reasonable and necessary conservation measure and that its application is necessary in the interest of conservation." *Mille Lacs II*, 861 F.Supp. at 838. Case law supports the position of the Bands that "conservation" as that term is used in the context of Indian treaty rights, should be interpreted more narrowly than in other contexts. In *United States v. Washington*, 384 F.Supp. 312, 342 (W.D.Wash.1974) *aff'd* 520 F.2d 676 (9th Cir. 1975) *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), the district court determined that Indian treaty rights are "rights which are made the supreme law of the land by the federal constitution." Thus, the state's power to regulate such rights must be interpreted narrowly and sparingly. *Id.* "Every regulation of treaty right fishing must be strictly limited to specific measures which before becoming effective have been established by the state, either to the satisfaction of all affected tribes or upon hearing by or under direction of this court, to be reasonable and necessary to prevent demonstrable harm to the actual conservation of fish." *Id.* The court went on to state that "[h]owever broadly the word may be used and applied in the theory and practice of fisheries science and management, 'conservation' as used in Supreme Court decisions and herein is limited to those measures which are reasonable and necessary to the perpetuation of a particular run or species of fish." *Id.* In affirming the district court, the Ninth Circuit held that although a state program to manage its fisheries may appear sound and commendable, the state must recognize that it shares its rights in those fisheries with the Indians.

It may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens. The state must pursue its goals as best it can by regulating its own non-treaty Indian citizens. The state may secure treaty Indians' compliance with these regulations only by gaining their acquiescence in its goals. Direct regulation of treaty Indian fishing in the interest of conservation is permissible only after the state has proved unable to preserve a run by forbidding the catching of fish by other citizens under its ordinary police power.

*United States v. Washington*, 520 F.2d 676, 686 (9th Cir.1975) *cert. denied* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (*citing, Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975)). In *United States v. Oregon*, 718 F.2d 299, 305 (9th Cir.1983), the term "conservation" as used in the context of treaty usufructuary rights, was further defined to include measures designed to ensure a reasonable margin of safety against extinction.

We can easily foresee instances in which limitations on the geographical aspect would be proper under the treaty even though extinction of the rights as a species was not imminent. Conservation, properly understood, embraces procedures and practices designed to forestall the imminence of extinction. Preserving a "reasonable margin of safety" between an existing level of stock and the imminence of extinction is the heart and soul of conservation. Limitations on the geographic aspect of the tribes' treaty rights to promote that end are permissible.

*Id.* Limiting the taking of a species or resource in a particular geographic area may also be permissible, if it is reasonable and necessary in the interests of conservation. *LCO IV*, 668 F.Supp. at 1236 (*citing, Sohappy*, 302 F.Supp. at 908). A conservation measure is reasonable if it is "appropriate to its purpose." *Id.* (*citing, United States v. Washington*, 384 F.Supp. at 342). A conservation measure "is necessary if it is 'essential to conservation.'" *Id.* The regulation may not be imposed if the Band can effectively self-regulate and such tribal regulations are sufficient to meet conservation needs. *Mille Lacs II*, 861 F.Supp. at 839.

The Bands submit that they have agreed to manage their own deer harvests by setting quotas in each of the State's permit units and closing the unit to further hunting of anterless deer once the quota has been taken. The Bands have further agreed that their quotas will not exceed 50% of the harvestable surplus in any permit unit, but that their total quota will not exceed 900 deer in the Ceded Territory for the first five years of harvest, which total represents only 7 to 11% of the annual harvest in the Ceded territory in recent years. The Bands further argue that the State has failed to submit any evidence that the prohibition of shining deer over bait in December is needed for conservation purposes in light of the Bands' Management Plan and Code. The Bands assert that the State's concern about this harvest method is only about conservation of local concentrations of deer and the general distribution of deer in the Ceded Territory.

To support their position, the Bands have pointed out that the State's expert reports and deposition testimony confirm that the State's interest does not meet the conservation standard. The Bands point to the report of the State's experts Jay McAninch and David R. Schad in which they state that the State's population goals for various management units is based on the management objectives of "prevent[ing] abundant populations from causing excessive agricultural crop damage or deer-vehicle accidents, and scarce populations where people are not able to view or hunt deer as successfully as they would like. The permit areas are used to prevent localized depletion or excessive expansion of deer populations." McAninch and Schad Report at 16. The Bands also point to the deposition testimony of Mr. Schad, in which he conceded that various management objectives, such as a biologist's desire to see more deer in an area, to a hunter's desire to kill a lot of deer, to the public's desire to see a lot of deer, could be taken into consideration in setting a population goal for a particular harvest unit. Schad Dep. at 64–65. The Bands also point to the deposition testimony of Mr. McAninch, in which he stated the "the ultimate goal of all these is to maintain that goal density, and the goal density is predicated on a set of deer conditions and relations with landowners and all those kinds of things." McAninch Dep. at 157. More importantly, Mr. McAninch agreed that localized harvest does not resemble extinction over the entire unit, as deer will replenish and reoccupy the area from where the animals are removed., McAninch Dep. at 156. The Bands assert that based on the above, the State cannot meet its burden to show shining deer over bait in December is necessary to preserve the deer population in even a particular management unit.

The State responds that a permissible conservation measure may be implemented in a specific geographic region, that it need not be measured across the entire Ceded Territory. The State further points out that at his deposition, the Bands' expert, Jonathan Gilbert, acknowledged that avoiding harvest of winter-stressed deer is a valid concern, which is why the Band chose to limit its season to December 31. Gilbert further testified, however, that there was little evidence to show deer are winter-stressed prior to December 31. The State responds that its experts can point to ample evidence that deer become winter-stressed prior to December 31. Thus, there is a genuine issue of material fact as to when deer become winter-stressed, which requires summary judgment be denied. The State also argues that the Bands' definition of "conservation" is too narrow and illogical, for it would allow hunting to the extent that the species is down to the bare minimum of animals necessary to survive. The State would ask that the Bands submit evidence as to why the State's biologists are mistaken about the need for a restriction on shining deer and that such matter should be determined after trial.

The Court finds that although the Bands' expert concedes the harvesting of winter-stressed deer is a valid concern, such fact does not create a genuine issue of material fact which precludes summary judgment. The Court has thoroughly reviewed the expert reports and expert deposition testimony and finds that the State has failed to meet its burden of establishing a genuine issue of material fact exists that its regulations to prohibit the shining of all deer over bait in December by Band members is necessary for

conservation. As the case law reveals, the State's power to regulate Indian treaty rights is very narrow. And although the State may have commendable and sound reasons for its proposed regulations, it is nonetheless constrained by the rights of the Bands' treaty rights. Thus, the State must put forth specific evidence establishing why the regulation is a measure "to forestall the imminence of extinction." *United States v. Oregon,* 718 F.2d at 305. The record before the Court establishes that the State has many management objectives that are taken into consideration when setting population goals within its permit areas, which include recreational as well as biological concerns. McAninch Dep. at 184. Thus, the evidence does not support the State's assertion that its concern is based solely on the perpetuation of the deer, rather than its various other management objectives, such as recreational concerns, i.e. hunting or public viewing. And as pointed out by the Bands, Mr. McAninch testified at his deposition that the elimination of deer in a local unit would not translate into extinction as deer would naturally reoccupy a depleted area over a short time.

Even if the State established that some regulation of deer shining over bait in December was necessary for conservation, the State has failed to put forth evidence that the complete prohibition is necessary for conservation, taking into consideration the Bands' agreement to limit its harvest to a total harvest of 900 anterless deer in the Ceded Territory.

Finally, the Bands argue, and the Court agrees, that even if the Court were to find the State's showing was sufficient to create a genuine issue of material fact as to whether the prohibition of deer shining over bait in December is needed for conservation, it would nonetheless be entitled to summary judgment as the Bands have shown such prohibition is not the least restrictive alternative to meet its conservation objectives. The Bands assert that its expert, Mr. Gilbert, states that less restrictive means are available to address the State's concerns, such as limiting shining over bait in December to antlered deer, a prohibition in areas of high deer concentration or managed on the basis

of the State's proposed study of deer movements. Gilbert Aff. at ¶ 25. The Bands also assert that the State's own experts made it plain that they did not attempt to develop less restrictive means to address their concerns. *See* Schad Dep. at 19, 23–24, 78–79; McAninch Dep. at 186–187. The Bands assert, and the Court concurs, that the State did not submit any evidence to dispute the assertion that less restrictive means are available. Thus, the State has failed to meet its burden on summary judgment to show a genuine issue of fact exists that less restrictive means are available.

Based on the above, the Court finds that summary judgment in favor of the Bands is appropriate. Accordingly, Minn.Stat. §§ 97B.081, 97B.311 and Minn.Rules 6232.0300 and 6232.1300 cannot be applied to Band members exercising their treaty rights pursuant to Band regulation, as provided in the Stipulations and their attachments.

### 6. Regulation to prohibit use of gillnets in lakes under 1,000 acres

The Bands have also moved for summary judgment on the issue of whether the State can regulate their treaty rights by prohibiting all use of gillnets in lakes that are under 1,000 acres. Based on the expert reports of Dr. Charles Anderson and Dennis Schupp, the State asserts that a prohibition of the use of gillnets in lakes under 1,000 is necessary for conservation purposes. The State argues, however, that the deposition testimony and expert reports on this issue raise genuine issues of material fact which would render summary judgment inappropriate. The Bands respond that the State's experts do not establish that this prohibition is necessary for conservation and that summary judgment is appropriate.

The State's concern regarding the use of gillnetting in lakes under 1,000 is twofold: gillnetting is an effective fishing method and may result in a removal of a large fraction of fish from a lake in one lift (the effectiveness of a gillnet is referred to as its "catchability"); or one lift may remove a small number of one species of fish, and incidentally remove a large amount of another species (referred to as "bycatch"). Anderson and

Schupp Aff. at ¶ 5. The State's experts assert that the increase in gillnet catchability in smaller lakes makes it difficult to predict the amount of fish that may be taken by each net, and that such unpredictability could result in an unintentional over harvest. Anderson and Schupp Aff. at ¶¶ 7 and 9. As with catchability, the bycatch of nontargeted species is higher in smaller lakes. Anderson/Schupp Rebuttal Report at 11.

The Bands do not dispute that gillnetting in smaller lakes poses conservation concerns. The Bands argue, however, that a complete prohibition of gillnetting in lakes under 1,000 acres is not necessary for conservation. The Bands first point out that there are over 100 lakes in the Minnesota Ceded Territory that are between 100 and 1,000 acres and that the Band's Management Plan and Code provides for gillnetting in only eight of those lakes. Moreover, the Band's Management Plan and Code requires a quota based on a lake survey before gillnet fishing can take place on such lake, and restricts the amount of gillnets that can be used based on the quota. Hoenig and Myers Report at 32. The Bands have also imposed restrictions on the size of gillnet mesh that can be used to be protective of the resource and that the surveys required to set the quotas and the data generated from Band fishing would generate a large amount of information to allow for further assessment of resources. *Id.* The Bands assert that their self-regulation addresses the conservation concerns of the State, therefore the State cannot impose its regulations on the Bands treaty rights in this regard.

The Bands also argue that they are entitled to summary judgment on this issue because the complete prohibition of gillnetting on lakes under 1,000 acres is not the least restrictive measure to meet its conservation concerns. The Bands first point to the deposition testimony of one of the State's experts, Dennis Schupp.

Q: Do you think you could come up with any examples where it was sufficiently limited that it wouldn't present a conservation concern?

A: Yeah. I think from our catchability model we could probably make some judgment on where—what that level might be.

Q: And has there been any attempt to do that?

A: There hasn't, but it could be done.

Schupp Dep. at 62–63. The Bands assert that this unrebutted testimony establishes that there is some level of gillnetting on smaller lakes that do not pose a conservation concern, and that such limit can be determined by the State's current catchability model. Further, the Bands assert that the deposition testimony of Mr. Schupp establishes that the State's concern regarding bycatch, the netting of non-targeted species, does not justify the 1,000 acre limit.

Q: Well, the State's position is that the Bands should be prohibited from gillnetting in lakes less than 1,000 acres; is that correct?

A: Yes.

Q: And one of the rationales for that is that bycatch increases with decreasing lake size; is that correct?

A: Uh–Huh.

Q: Okay. In terms of that particular rationale, how did you—how does that support 1,000 as opposed to 800 or 600 acres?

A: This come back to our catchability model that—and refers to walleye. The thousand acres is based only on catchability of walleye.

Q: Okay. So that concern about the increase in bycatch with decreasing lake size wasn't the basis for the thousand acre limitation?

A: No.

Schupp Dep. at 59–60. The State responds that Mr. Schupp clarified in his Affidavit that bycatch is an underlying concern, but that the bycatch concern is not the basis for the 1,000 acre limitation. The Bands point out, however, that it is the State's burden to prove its regulation is the least restrictive measure to address its conservation concerns, and that the bycatch concern does not support the 1,000 limitation. Finally, the Bands argue that the State's use of gillnetting on these smaller lakes for survey purposes demonstrates that a complete prohibition of gillnetting on smaller lakes is not necessary for conservation purposes.

The State points out that gillnetting on lakes under 1,000 acres is not allowed in Wisconsin. In *LCO VI, supra*, the court held that the State successfully established that the prohibition of gillnetting on all lakes under 1,000 acres was necessary for conservation.

> Defendants have never contended, and there is no basis for finding, that either the muskellunge or the walleye is in danger of extinction from the ceded territory if plaintiffs' rights are not restricted. They have shown, however, that unrestricted fishing could cause the collapse or even the extirpation of the stock of a particular lake, with the consequence that the lake might never again sustain such a stock. This legitimate concern merits consideration. Defendants need not show that a particular rule or regulation is necessary to preserve the entire species from extinction within the ceded territory; they need show only that the measure is necessary to preserve the stocks in the majority of the walleye and muskellunge lakes. *See, Department of Game of Washington v. Puyallup Tribe*, 414 U.S. 44, 49, [94 S.Ct. 330, 333–34, 38 L.Ed.2d 254] (1973).

*LCO VI*, 707 F.Supp. at 1056. As noted by the Bands, they do not seek the unrestricted right to gillnet on all lakes under 1,000 acres. They only seek to exercise such right on eight out of over 100 such lakes, ranging in size from 110 acres to approximately 696 acres. Furthermore, the Bands have agreed to a number of restrictions on gillnetting in these lakes to address the conservation concerns raised by the State, another factual distinction from the record before the court in *LCO VI*.

The State asserts that the Court needs to evaluate the potential risk of gillnetting on all the lakes under 1,000, because a legal determination that there is no conservation concern on a smaller lake may cause the Bands to amend their Code in the future to permit gillnetting in more lakes, and the State will have lost its ability to raise a valid conservation concern. The State's position is not supported by the law.

■ Again, the State may regulate Indian Treaty rights in the interests of conservation, if such regulation meets the appropriate standards and does not discriminate against the Indians. However, even if the State regulation meets the appropriate standards and is not discriminatory, the State is nonetheless barred from regulating the Indian treaty rights if the Bands can effectively self-regulate and the tribal regulations are adequate to meet conservation needs. Such determination is, by definition, fact specific. Thus, ruling that gillnetting on eight lakes under 1,000 acres meets the State's conservation interests would not preclude the Court from revisiting the issue if the Bands moved to amend their Code to allow gillnetting in all the lakes under 1,000 acres.

■ The Court agrees that the record before it is distinguishable from the record before the Wisconsin court in *LCO VI*. The Bands only seek to gillnet in a small percentage of the available lakes under 1,000 acres in the Minnesota Ceded Territory. As noted by the court in *LCO VI*, the State "need show only that the measure is necessary to preserve the stocks in the majority of the walleye and muskellunge lakes." 707 F.Supp. at 1056. The State cannot meet this burden, however, because the Bands only seek to gillnet on eight lakes under 1,000 acres. *Id.* Furthermore, the Bands have imposed many restrictions on Band members' ability to gillnet in these lakes, in order to address the State's concerns. The State has not met its burden of establishing a genuine issue of material fact exists that such Band regulations do not meet its conservation concerns. The Court also finds that the Bands have shown that a complete prohibition of gillnetting on lakes under 1,000 acres is not the least restrictive measure to address its conservation concerns. Accordingly, summary judgment in favor of the Bands is appropriate.

The Court is not declaring that all gillnetting on smaller lakes by the Bands is permissible. The Court is simply holding that at this time, the Bands may gillnet on those lakes identified in its Management Plan and Code, subject to the restrictions contained therein.

## II. Motion for Entry of Final Judgment or alternatively, Preliminary Injunction

The Bands request that in the event its motion for summary judgment as to regulatory issues is granted in its entirety, that the Court enter an Order incorporating the terms of the Stipulation, which would allow Band members to immediately begin exercising their usufructuary rights. The State agrees that if the Court grants Plaintiffs' motion for summary judgment on the regulatory issues, entry of final judgment is appropriate.

■ Because summary judgment has been granted to the Bands on all regulatory issues, the motion for entry of final judgment is granted.[6]

## III. Motions for Summary Judgment on Resource Allocation

The Bands move the Court for summary judgment as to resource allocation issues. The Counties and Landowners have also filed motions for summary judgment concerning allocation issues. See, Counties' Motion for Summary Judgment re: Moderate Living, and Landowner's Cross motions One through Four.

By its motion, the Bands move for summary judgment on the following issues: 1) that there is no basis for an allocation on the present record; or 2) if the Court deems an allocation is necessary, it should be an equal allocation, with the ceiling on the Band's harvest set at 50% of the harvestable surplus of the resource in question. The United States has submitted a memorandum fully supporting the position of the Bands.

The Bands argue that allocation of resources is appropriate only upon a threshold showing that allocation is necessary to protect the Indians' treaty right to harvest or to prevent the Indians' harvest from exhausting the resource and thereby depriving non-Indians of harvest opportunities. The Bands further argue that in the absence of a showing of need, courts have declined to allocate resources between the Indian and Non-Indian harvesters. Because it is the defendants who seek an allocation, the Bands also assert that the burden is on the defendants to show such allocation is necessary.

The State opposes the Bands' motion for summary judgment on allocation issues, asserting genuine issues of material fact exist which warrants a trial. The Counties and the Landowners argue they are entitled to summary judgment on the allocation resource issues. The defendants all rely on similar arguments in support of their positions. First, the defendants assert that the Bands' analysis of the allocation issues is flawed. It is their position that the central and prerequisite issues to allocation are determining the monetary measurement of a moderate standard of living and whether the Bands have achieved that level. Such a determination must be made because whether or not the Bands have achieved a moderate standard of living directly dictates what portion of the harvestable surplus of a resource to which the Bands are entitled. For example, if the Bands prove they have not achieved a moderate standard of living, the Court must determine what percentage of the harvestable surplus will bring the Bands to the level of a moderate standard of living. However, if the Bands have achieved a moderate standard of living, they are only entitled to that percentage of the harvestable surplus that will meet their ceremonial or religious needs. The defendants also assert that in determining the moderate standard of

---

6. The Landowners have filed a motion to dismiss the Bands' claim for injunctive relief on the basis that an adequate remedy exists at law. The Landowner's argue that money damages are the appropriate remedy. As conceded by the State in its motion in opposition to the Bands' motion for entry of a final order or preliminary injunction at page 2, injunctive relief is the appropriate remedy in treaty rights cases given the unique nature of the rights and the inability to quantify damages. United States v. Washington, 384 F.Supp. 312, 404 (W.D.Wash.1974). Injunctive relief has been repeatedly granted in treaty rights cases. See, e.g., United States v. Washington, 384 F.Supp. at 405; United States v. Washington, 459 F.Supp. 1020 (W.D.Wash.1978) aff'd, 645 F.2d 749 (9th Cir.1981); Washington v. Passenger Fishing Vessel, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); United States v. Oregon, 769 F.2d 1410 (9th Cir.1985); Lac Courte Oreilles Band v. Wisconsin, 775 F.Supp. 321 (W.D.Wis. 1991). The Landowners' motion to dismiss the claim for injunctive relief must be denied.

living, all sources of income are taken into consideration, not just whether the Bands can reach a moderate standard of living solely through the exercise of its usufructuary rights. The defendants contend that the burden of establishing these issues is on the Bands. Finally, the defendants assert the necessary showing for the need to allocate resources has been made.

### A. Is Allocation Necessary.

The Bands first assert that neither they, nor the United States, are seeking an allocation of the resources available for harvest under the 1837 Treaty. Instead, the Bands have developed management plans to allow for the gradual development of treaty harvests. In light of these plans, the Bands assert there is no need to allocate the resources between Indian and non-Indian harvesters. The Bands have taken the position that the 1837 Treaty provides them a non-exclusive right to the harvestable resources in the Minnesota Ceded Territory, not an unlimited right. Therefore, the Bands acknowledge that non-Indian harvesters have a right to a fair share of the resources. However, given the fact that the Bands' Management Plan and Code restricts the Bands' harvest well below an equal share of the available harvest, the defendants cannot show the Bands' harvest would impinge on the non-Indians' right to a fair share.

The Bands argue that allocation is a form of equitable relief, and that such relief should not be granted absent a compelling need to do so. In support of its position, the Bands cite the Court to cases involving the equitable apportionment of water, fish and other natural resources between states which have held allocation of a resource will not be made unless the party seeking the allocation proves by clear and convincing evidence some real and substantial injury or damage. *Idaho ex rel. Evans v. Oregon,* 462 U.S. 1017, 103 S.Ct. 2817, 77 L.Ed.2d 387 (1982); *Colorado v. New Mexico,* 459 U.S. 176, 187–88, n. 13, 103 S.Ct. 539, 548, n. 13, 74 L.Ed.2d 348 (1979). The State did not respond to the

argument that it need show a substantial or irreparable injury before the equitable relief of allocation may be granted. Instead, relying on the *LCO* decisions, the State asserts that it has established the need for an allocation because the demand for certain resources by non-Indian harvesters exceeds the available supply. The Landowners argue the equitable apportionment doctrine is inapplicable in this case, because the cases applying the doctrine involved Indian water rights adjacent to Indian reservations and that this case does not involve an Indian reservation.

In *Idaho ex. rel. Evans,* the State of Idaho sought "an equitable apportionment against the states of Washington and Oregon of the anadromous fish that migrate between the Pacific Ocean and spawning grounds in Idaho." 462 U.S. at 1018, 103 S.Ct. at 2819. The case was tried before a Special Master, who denied Idaho relief because Idaho had failed to demonstrate it suffered any injury by the states of Washington and Oregon and because it would be impossible to fashion a decree to apportion the fish fairly among the parties even if sufficient injury were shown. *Id.* at 1024, 103 S.Ct. at 2822–23. The Court determined that the natural resource of anadromous fish is sufficiently similar to water rights to allow for the application of the equitable apportionment doctrine to resolve allocative disputes. *Idaho ex rel. Evans,* at 1024, 103 S.Ct. at 2822–23.[7]

> The anadromous fish at issue travel through several States during their lifetime. Much as in a water dispute, a State that over-fishes a run downstream deprives an upstream State of the fish it otherwise would receive. A dispute over the water flowing through the Columbia–Snake River system would be resolved by the equitable apportionment doctrine; we see no reason to accord different treatment to a controversy over a similar natural resource of that system.

*Id.* The Bands argue that the case before this Court similarly involves a dispute between sovereigns and their respective rights

---

7. In *Arizona v. California,* 373 U.S. 546, 597, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1962), the Court held that the equitable apportionment doctrine should not apply to disputes to water rights

between Indian Reservations and states because the Indians' claims are governed by the statutes and Executive Orders that created them.

to the natural resources in the Minnesota Ceded Territory. Accordingly, the Bands argue that before this Court can make an allocation, the defendants must establish a substantial or irreparable injury or damage to its rights to the resources in light of the 1837 Treaty.

Although not explicitly provided therein, in those cases where an allocation of a resource was made between treaty harvesters and non-treaty harvesters, it is clear from the record of such case that a substantial or irreparable injury or damage had occurred to the right to harvest a resource.

In *Passenger Fishing Vessel, supra,* the Court held that an allocation of anadromous fish in the waters of the state of Washington was necessary to protect the Indians' treaty right to fish. The decision to allocate the fish resources was based, in part, on the fact that at the time the treaty was signed, neither the Indians or non-Indians contemplated that either party would interfere with the others' rights to fish, given the great abundance of the fish that existed at that time. *Id.* at 668, 99 S.Ct. at 3065–66. Accordingly, the parties did not intend to regulate the taking of fish by either party, nor was future regulation foreseen. *Id.* However, economic developments in canning and processing had resulted in the dominance of non-Indian fisheries and the eventual exclusion of the Indians from participating in fishing, "a trend that was encouraged by the onset of often discriminatory state regulation in the early decades of the 20th century." *Id.* at 668–669, 99 S.Ct. at 3066. Because the fish resources had become scarce, and because Indians were being excluded from participating in fishing due to means beyond their control, the Court held it critical to determine the meaning of the Indians treaty rights before making an allocation determination. *Id.* at 669, 99 S.Ct. at 3066.

Taking into consideration the historical context and the treaty language, the Court held the purpose and language of the treaty secured the Indians a right to take a share of each run of fish that passes through Indian tribal fishing areas. *Id.* at 679, 99 S.Ct. at 3071. Because the Indians had a right to a share of each run of fish that passed through

their tribal fishing areas, the fact that they were being excluded from participating in fishing would clearly support a finding of a substantial and irreparable injury to their treaty rights.

The defendants argue the *LCO* decisions support its position that it need only show a heavy demand for a resource to warrant allocation. The *LCO* decisions in their proper context, however, establish that allocation is proper only when substantial or irreparable damage occurs to the right to harvest resources in light of the treaty.

In determining when and if an allocation of a resource was necessary under the 1837 treaty, Judge Doyle relied heavily on *Passenger Fishing Vessel.* See, *LCO III,* 653 F.Supp. at 1433–34. In *LCO III,* the court refused to allocate a fixed share of any resource to the parties because such an allocation was unwarranted on the record currently before the court.

Allocation has arisen in the Washington fishing rights cases in modern times in light of the scarcity of resources, such as steelhead and salmon, and because of the intense demand by Indians and non-Indians alike for those resources. In Washington, both Indians and non-Indians are involved extensively in commercial fishing. The modern fishing practices of non-Indians had the potential to harvest all of the steelhead and salmon before they ever reached the Indians' fishing grounds. In light of these circumstances, the court allocated between the Indians and non-Indians the harvestable share of the desired fish. The allocation was based on the specific language of the treaty between the Indians and the United States . . .

Neither the Chippewa nor the state of Wisconsin, I believe, suggests that a fixed share of any resource should be apportioned to the Chippewa, at least at this stage. Such an allocation is unwarranted at this time. Neither party has presented evidence that any particular species is endangered in the ceded territory. The Washington allocation cases differ from this case in significant respects: (1) no finding has been made here of scarcities of

resources; (2) the language of the Chippewa treaty is different.

*Id.* 1434–35.

Despite repeated requests, the court in *LCO* refused to allocate the harvestable resources in the Ceded Territory because the record did not establish that Indian treaty harvesting was endangering a particular species. *LCO IV*, 668 F.Supp. 1233, 1240; *LCO V*, 686 F.Supp. 226, 233 [8]; *LCO VI*, 707 F.Supp. 1034, 1058.

In *LCO VII, supra*, the court finally agreed to make an allocation, even though no showing had yet been made that any resource was in danger, finding the heavy competition for the most desirable of species met the necessary predicate for allocation.

> For example, the non-Indian hunting demand for anterless deer exceeds the available supply. In this sense, deer hunting is unlike non-Indian angling for walleye, which is essentially self-regulating, and it is like the salmon and trout fishing that was at issue in the Washington cases.
>
> The showing of heavy competition establishes the predicate for addressing the issue of allocation. The full development of the record makes it possible to do so.

*LCO VII*, 740 F.Supp. at 1414. In addition to the existence of a heavy demand for certain resources, the court was also concerned that the Indians' harvesting capacity was not a workable long term solution, as their harvesting capacity was "bound to increase substantially as more of their members would utilize their newly reconfirmed harvesting opportunities." *Id.*, 1414–15. This concern more than likely stemmed from the fact that the Indians were asserting a right to harvest the resources to the extent needed to meet their moderate living needs. Thus, the Indian Bands argued they were entitled to a primary right to all harvestable resources, leaving to the non-Indians whatever was left

over.[9] Based on the court's previous finding that all of the resources in the ceded territory were insufficient to provide the Bands a moderate standard of living [10], allowing the Indians to harvest as much of the resources as possible threatened the right to the non-Indians' equal share to the harvestable resources in the Ceded Territory. Thus, allocation was necessary to protect the rights of the non-Indians to the resources in the Ceded Territory. *Id.*, at 1416.

In this case, the Bands assert that both sides have a right to a fair share of the harvestable resources in the Minnesota Ceded Territory and that, subject to the foregone opportunity doctrine, the treaty harvest is subject to a 50% ceiling. Therefore, there is no possibility that the Bands' exercise of their usufructuary rights could possibly impinge upon the non-Indians fair share to the resources, given its Management Plan and Conservation Code which set the Bands' quotas well below 50%. Furthermore, the Bands point out that the court in *LCO VII* agreed to make an allocation only because "[t]he full development of the record makes it possible to do so." *Id.*, at 1414. In this case, the record has not been developed due to the fact that the Bands have not yet had the opportunity to exercise their usufructuary rights without the threat of illegal regulation by the State.

The State argues that a showing of heavy competition of a particular species, in and of itself, is sufficient to warrant allocation of that species, because any exercise of Band harvest will cause the State to restrict non-Band harvesters to avoid harvesting over the harvestable surplus. The Court is not persuaded such a showing is sufficient to warrant allocation. And given the divergent positions of the Bands in the *LCO* litigation and in this case, the Court is not convinced that the decision in *LCO VII*, supports the position the State now asserts.

---

8. In her opinion following the moderate standard of living trial, Judge Crabb stated the 50/50 allocation made in *Passenger Fishing Vessel*, was proper where it had been shown that allocation was necessary both to protect the species and to protect the Indians' right to harvest the species. *LCO V*, 686 F.Supp. at 232.

9. This position was consistent with a prior ruling by Judge Doyle in which he found that the Indians enjoy a greater right to hunt, fish and gather in the ceded territory than do non-Indians; the Indians rights are paramount. *LCO III*, 653 F.Supp. at 1435.

10. *LCO V*, 686 F.Supp. at 231.

The Court finds the position of the Bands persuasive and consistent with applicable case law. A treaty between the United States and an Indian tribe "is essentially a contract between two sovereign nations." *Passenger Fishing Vessel*, 443 U.S. at 675, 99 S.Ct. at 3069. It has already been decided that the Bands have continuing rights to hunt, fish and gather under the 1837 Treaty. *Mille Lacs II*, 861 F.Supp. at 841. Before this Court should undertake the task of allocating resources between sovereign nations that each have rights in various natural resources, a showing of more than just a heavy demand to a particular species that may, or may not, result in less resources available for non-Indian harvest is required. Accordingly, before a party can receive the equitable relief of allocation, the party seeking an allocation must establish that their right to a fair share of a particular harvestable resource has been substantially or irreparably injured as a result of the other party's harvest of such resource. *See, Idaho ex rel. Evans*, 462 U.S. at 1027, 103 S.Ct. at 2824 (citations omitted). The determination of injury should be based on present conditions. *Id.*

The Bands argue, and this Court agrees, that as the defendants have requested that the Court allocate at least certain of the resources, it is the defendants' burden to establish that their right to a fair share of such resource has been substantially or irreparably damaged by the Bands' harvest of that resource. No such showing can be made at this time, however, because the Bands have had no opportunity to exercise their usufructuary rights under the 1837 Treaty. Accordingly, the record does not contain any evidence of current injury or damage, or even a likelihood of substantial injury or damage, to the rights of non-Indians to a fair share of the resources.

Although the time may come when an allocation of a resource will have to be made, the Court finds it would be inappropriate to do so at this time.

B. Moderate Standard of Living Doctrine.

In their motions for summary judgment, the Counties and Landowners assert that each of the Bands' treaty rights have been fully satisfied since each has achieved a moderate standard of living without relying on their usufructuary rights. Thus, the Bands are not entitled to any portion of the harvestable resources. Alternatively, the Counties argue the Court should conclude the Bands have failed to establish a need for increased harvest rights under the moderate standard of living doctrine and should thus prohibit the Bands from engaging in commercial harvest.

Although the State asserts genuine issues of material fact exist as to whether the Bands have achieved a moderate standard of living, the State's position on the moderate standard of living doctrine, and how it is to be applied in this case, is consistent with the positions asserted by the Counties and Landowners—that before the allocation of a resource should be quantified, the Court must first determine whether or not the Bands have achieved a moderate standard of living. In determining whether or not the Bands have achieved a moderate standard of living, the defendants argue that the Court must look to all sources of income, not just whether the Bands can achieve a moderate standard of living through the harvesting of resources in the Ceded Territory. The defendants assert that this procedure was followed by the court in the *LCO* litigation and in *United States v. Washington*, 873 F.Supp. 1422 (W.D.Wash.1994) and is consistent with the Supreme Court's holding and reasoning in *Passenger Fishing Vessel*.

The Bands assert that the moderate standard of living analysis proffered by the defendants is a serious misconception about the function of the moderate standard of living doctrine. The Bands first assert that the Supreme Court cases hold that the treaty rights reserved must be quantified in light of the purposes of the treaty. Thus, quantification of the Bands' treaty rights must take into account the purpose for which hunting, fishing and gathering were preserved. The Bands also assert that to take into consideration income from sources other than from hunting, fishing and gathering is inconsistent with the principles articulated in *Passenger Fishing Vessel*. The Bands argue that income from other sources is relevant only if it

leads them to abandon their usufructuary rights, and there is no evidence that the Bands in this case have abandoned their rights. Finally, the Bands argue that reducing their treaty allocation on the basis of other income does not account for the right of the Bands to pursue hunting, fishing and gathering activities reserved by the treaty. Furthermore, the defendants' position on the moderate standard of living does not recognize the non-economic benefits that the Bands derive from hunting, fishing and gathering. The Bands assert that requiring them to address the moderate standard of living doctrine as a prerequisite for exercising their usufructuary rights is not supported by case law.

The starting point for both the Bands' and the defendants' argument as to allocation and the moderate standard of living doctrine is the opinion of the United States Supreme Court in *Passenger Fishing Vessel, supra.* Thus, that is where this Court begins its analysis.

In *Passenger Fishing Vessel,* the United States Supreme Court affirmed the findings of the district court that an equal amount of the anadromous fish runs should be assured to the Indians, to give proper meaning to the intent and purposes of the parties when the treaty was entered into. *Id.* at 685, 99 S.Ct. at 3074.

> It bears repeating, however, that the 50% figure imposes a maximum but not a minimum allocation. As in *Arizona v. California* and its predecessor cases, the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say a moderate living.

*Id.* at 686, 99 S.Ct. at 3075. The defendants argue that this passage supports their view that the Bands are only entitled to that share of the resources that will bring them up to the level of a moderate standard of living, taking into consideration all sources of in-

come. The State asserts that the Court did not qualify its statement that the Indians' livelihood must originate from fishing, even though it could have easily done so. The State further asserts the equal division was not litigated on the basis of moderate living needs, but rather on the basis of treaty interpretation. The Court finds these arguments without merit, for they ignore the context in which the above passage was made.

In *Passenger Fishing Vessel,* the Court was faced with the issue of whether and how to allocate a resource that had once been inexhaustible. In making this determination, the Court held that it was necessary to determine the intent of the treaty signatories to determine the rights of the Indians to take the resource. *Id.* at 669, 99 S.Ct. at 3081–82. The treaty at issue provided "[t]he right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory …" *Id.* at 674, 99 S.Ct. at 3069. The Game Department had argued that this language only granted the Indians the right of access over private lands to their usual and accustomed fishing grounds, and an exemption from paying license fees. *Id.* at 671, 99 S.Ct. at 3067. The Court held that the treaty must be interpreted as the Indians would have understood it. *Id.* at 675, 99 S.Ct. at 3069. To make this determination it was necessary for the Court to review the historical context of the treaty and the language used. *Id.* at 676, 99 S.Ct. at 3069–70. The Court thereafter found the Indians would not have understood the treaty to guarantee them only an equal opportunity to fish. *Id.* The use of the words "right to take fish" together with "secured to said Indians" was interpreted as intending to secure or reserve to the Indians a share of each run of fish, rather than a personal right to attempt to take fish. *Id.* The Court went on to state that this interpretation of the treaty was not open to question as it had been a " 'matter decided' by our previous holdings." *Id.* at 679, 99 S.Ct. at 3071.

The first case interpreting the "Stevens Treaty",[11] and relied upon in *Passenger Fish-*

---

11. Governor Stevens was the principal negotiator in the treaties discussed in the Washington

fishing cases, including *Passenger Fishing Vessel,*

*ing Vessel,* was *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). At issue in *Winans* was the ability of a non-Indian harvester, who had acquired title to property on the Columbia River and a license to use a fish wheel, to exclude the Yakima Indians from one of their "usual and accustomed" places for fishing. The *Winans* Court rejected the argument that the Indians could be excluded based on the argument that the Indians acquired no rights "but such as they would have without the treaty." *Winans,* at 380, 25 S.Ct. at 664. The Court found, rather, that the treaty reserved to the Indians rights beyond those which other citizens may enjoy.

> The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. In other words, the treaty was not a grant of rights to the Indians, but a grant of right from them,—a reservation of those not granted. And the form of the instrument and its language was adapted to that purpose.... There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved in common with citizens of the territory. As a mere right, it was not exclusive to the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise. They were given the right of taking fish at all usual and accustomed places, ... The contingency of future ownership of the lands, therefore, was foreseen and provided for; in other words, the Indians were given a right in the land—the right of crossing it to the river,—the right to occupy it to the

and the treaties have been thus referred to as the Stevens Treaties.

**12.** *Puyallup Tribe v. Washington Dept. of Game,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689

extent and for the purpose mentioned. No other conclusion would give effect to the treaty.

*Winans,* at 381, 25 S.Ct. at 664.

Not only did the Court in *Passenger Fishing Vessel* find the language of the *Winans* opinion significant, it found the actual disposition of the case more so. *Passenger Fishing Vessel* at 681, 99 S.Ct. at 3072. For the *Winans* Court not only upheld the Indians' right of access to the respondent's private property, but assured the Indians a share of the fish by ordering the Circuit Court to devise some adjustment and accommodation that would protect them from total exclusion. *Id.* (citing, *Winans,* 198 U.S. at 384, 25 S.Ct. at 665).

Other decisions that formed the basis of the Court's holding in *Passenger Fishing Vessel* were the *Puyallup* [12] trilogy of cases, which explicitly held "that neither party to the treaties may rely on the State's regulatory powers or on property law concepts to defeat the other's right to a 'fairly apportioned' share of each covered run of harvestable anadromous fish." *Id.* at 682, 99 S.Ct. at 3072. The Court also noted that similar interpretations have been followed with respect to hunting rights, *Antoine v. Washington,* 420 U.S. 194, 205–206, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975) and water rights that were merely implicitly secured to the Indians by treaties reserving land. *Arizona v. California,* 373 U.S. 546, 598, 83 S.Ct. 1468, 1496–97, 10 L.Ed.2d 542 (1963), *(following, United States v. Powers,* 305 U.S. 527, 528–533, 59 S.Ct. 344, 344–47, 83 L.Ed. 330 (1939); *Winters v. United States,* 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908)).

In *Winters v. United States, supra* the Court addressed the 1888 treaty in which the Gros Ventre, Piegan, Blood, Blackfeet and River Crow Indians ceded a large tract of land and retained a portion which became the Fort Belknap Reservation. The issue

(1968); *Washington Dept. of Game v. Puyallup Tribe,* 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); *Puyallup Tribe v. Washington Dept. of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977).

addressed by the Court was whether the Indians had a superior right to the waters of the Milk River for domestic and irrigation purposes. In finding that the Indians did have superior rights to such waters, the Court recognized that the reservation was part of a larger tract of land which the Indians had the right to occupy and use, and which was adequate to serve their needs. *Winters*, 207 U.S. at 576, 28 S.Ct. at 211. Although the treaty did not mention a reservation of water, the Court reasoned such a reservation would have been intended by the parties at the time the treaty was signed.

> The Indians had command of the lands and the waters—command of all their beneficial use, whether kept for hunting, and 'grazing roving herds of stock' or turned to agriculture and the arts of civilization. Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate?

*Id.* The Court did not determine the appropriate measure of the water reserved by the Indians, but its reasoning and holding were later followed in a decision where such measure was made. *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

In *Arizona v. California* the Court was requested to make an equitable apportionment of the waters of the Colorado River between the states of Arizona, California, Nevada, New Mexico and Utah. The United States submitted claims to these waters for use on Indian Reservations. The Court determined that not only did the Indians reserve the lands that made up the reservations, but enough of the water from the Colorado River to irrigate the irrigable portions of the reserved lands. *Arizona,* 373 U.S. at 600, 83 S.Ct. at 1497–98 (*following, Winters v. United States, supra*). In reaching its decision, the Court explicitly rejected the arguments of the state of Arizona that the proper measure of the Indians' water rights would be assessed by the Indians' reasonably foreseeable needs as determined by the number of Indians residing on the reservation. *Id.,* at 601, 83 S.Ct. at 1498. "How many Indians there will be and what

their future needs will be can only be guessed. We have concluded ... that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage." *Id.*

From its review of the cases discussed above, the Court in *Passenger Fishing Vessel* held:

> The purport of our cases is clear. Non-treaty fishermen may not rely on property law concepts, devices such as the fish wheel, license fees, or general regulations to deprive the Indians of a fair share of the relevant runs of anadromous fish in the case area. Nor may treaty fishermen rely on their exclusive right of access to the reservations to destroy the rights of other 'citizens of the Territory.' Both sides have a right, secured by treaty, to take a fair share of the available fish.

*Id.* at 684–5, 99 S.Ct. at 3074.

Based on this principle of law the Court next determined that "an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and accustomed' place into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." *Id.* at 685, 99 S.Ct. at 3074. The Court acknowledged that its prior cases did not mandate this division, but that such practice is consistent with prior decisions. *Id.* The Court then went on to state:

> It bears repeating, however, that the 50% figure imposes a maximum but not a minimum allocation. As in *Arizona v. California* and its predecessor cases, the central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say a moderate living. Accordingly, while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will, upon proper submissions to the District Court, be modified in response to changing circumstances. If, for example, a tribe should dwindle to just a few mem-

bers, or if it should find other sources of support that lead it to abandon its fisheries, a 45% or 50% allocation of an entire run that passes through its customary fishing grounds would be manifestly inappropriate because the livelihood of the tribe under those circumstances could not reasonably require an allotment of a large number of fish.

*Id.,* at 686–687, 99 S.Ct. at 3075.

■ What *Passenger Fishing Vessel* and its predecessors establish is this: if an allocation of a resource must be made, such allocation should be quantified to fulfill the purposes of the treaty, while at the same time recognizing the rights of non-Indian harvesters to a resource. Thus, the threshold issue is not whether the Bands have achieved a moderate standard of living, but what was the purpose and intent of the treaty, and what amount of resources are needed to fulfill such purpose and intent. Where it is determined that the resource cannot meet the needs of both the non-Indians and the Bands, an allocation should be made.

■ In *Mille Lacs II,* Judge Murphy found that the Chippewa survived by hunting, fishing and gathering. 861 F.Supp. at 791. After thoroughly analyzing the treaty negotiations, Judge Murphy determined

> [t]he Chippewa understood that Article 5 allowed them to continue their hunting, fishing, and gathering way of life. The Chippewa also understood that Euro–Americans would begin to enter the ceded territory, but they did not believe that their arrival would interfere with their hunting, fishing, and gathering activities because of the size of the territory, the purpose of the treaty (access to pine timber) and the abundance of resources.

*Id.* at 797. Thus, the determination has been made that the 1837 treaty provides the Bands the *right* to continue a way of life based on hunting, fishing and gathering and that such right would not be limited. This finding is also consistent with those findings made in the *LCO* litigation.

> When they agreed to the treaties of 1837 and 1842, the Chippewa's understanding was as follows: They were guaranteed the right to make a moderate living off the land and from the waters in and abutting the ceded territory and throughout the territory by engaging in hunting, fishing and gathering as they had in the past and by consuming the fruits of that hunting, fishing and gathering or by trading the fruits of that activity for goods they could use and consume in realizing that moderate living.

*LCO III,* 653 F.Supp. at 1424.

The State argues that there is evidence that suggests that the Bands did not understand that their rights to hunt, fish and gather were unlimited. The State asserts that its expert, Dr. Paul Driben, has opined that the Chippewa understood that the privilege was a guarantee that they and their descendants would be able to earn a living by "pursuing natural resources in conformity with the fundamental principles of their culture." Feb. 7, 1996 Driben Rpt at 32. Dr. Driben also opines that the Chippewa "did not understand the privilege as one that would enable them and their descendants to become engaged in full-scale commercial exploitation of the resources in the territory ..." *Id.* The State asserts Dr. Driben's expert opinion establishes that the Bands did not understand that their right to hunt, fish and gather were unlimited. The Bands respond that it is not their position that they have exclusive rights to the resources in the Ceded Territory, rather they argue they have a non-exclusive right subject to the equal sharing principle of *Passenger Fishing Vessel.* The Bands also do not dispute that they had and continue to have a strong cultural tradition against over-harvest and over-exploitation of natural resources. Accordingly, this Court finds that the purpose of Article 5 was to guarantee the Bands the right to continue a way of life based on hunting, fishing and gathering, and that such right is limited by the right of non-Indian harvesters to a fair share.

The Court must reject the position of the defendants on the moderate standard of living doctrine because it would require the Court to completely ignore the purposes and intent of the 1837 Treaty, which guaranteed the Bands the right to continue their way of

life through hunting, fishing and gathering. The defendants' position also renders the usufructuary rights recently reconfirmed by this Court as meaningless, and would punish the Bands for seeking a living through other means at a time when they were wrongly denied the right to exercise their usufructuary rights by the State.

As stated by the Court in *Winans,* the treaty reserved a right to the Bands that they had always possessed. In this case, it is the right to a way of life based on hunting, fishing and gathering. Because it is a reservation of a right, not a grant of a right, the Bands must be given the opportunity to choose whether or not to continue with a way of life that is based on hunting, fishing and gathering. At this time, the Bands have not had the opportunity to make that choice, as the State has not allowed them to exercise their rights without the threat of state regulation. Until the Bands have had a reasonable opportunity to exercise their treaty rights, this Court will not address the moderate standard of living doctrine.

The Court believes this determination is entirely consistent with the language in *Passenger Fishing Vessel* regarding the change of circumstances that would warrant a reduction in the Indians' treaty share—if the tribe should dwindle to just a few members, or if it should find other sources of support that lead it to abandon its fisheries. *Id.* at 687, 99 S.Ct. at 3075. As noted above, the *Passenger Fishing Vessel* Court recognized that the Indian fisheries had declined due to illegal regulation and illegal exclusionary tactics. *Id.,* at 669, n. 14, 99 S.Ct. at 3066, n. 14. In recognizing this decline, the Court did not see fit to inquire as to whether or not the Indians found other sources of support as a result. Rather, the Court looked to the purpose of the treaty and determined such treaty provided the Indians a right to take fish to ensure them a moderate standard of living. Accordingly, the Court deemed the Indians were entitled to a fair share of the anadromous fish and that such share would be reduced if they chose to abandon their fishing rights. The use of the word "abandon" implies that such reduction could only be shown once the Indians were allowed to exer-

cise their rights without illegal regulation or exclusion by non-Indians. Furthermore, in determining the intent of the parties to the treaty, the Court determined that "[t]he impact of illegal regulation ... and of illegal exclusionary tactics by non-Indians ... in large measure accounts for the decline of the Indians fisheries during this century and renders that decline irrelevant to a determination of the fishing rights the Indians assumed they were securing by initialing the treaties in the middle of the last century." *Id.* at 669, n. 14, 99 S.Ct. at 3066, n. 14.

The defendants nonetheless argue that the moderate standard of living, as they have defined such term, has been applied by other courts. *See, LCO V,* 686 F.Supp. 226 (W.D.Wis.1988); *United States v. Washington,* 873 F.Supp. 1422 (W.D.Wash.1994). What distinguishes those cases from this case however, is the simple fact that the Indians had been exercising their treaty rights, without illegal state regulation, for years before the issue of allocation was addressed. That is not the case here.

Based on the above, the Court finds that as a matter of law, the Bands' share of the resources available under the 1837 Treaty cannot be reduced, before they have begun to exercise their treaty rights, because the Bands may have achieved a moderate standard of living from other sources. At the appropriate time, an allocation of resources will be made in a manner that will give full force and effect to the intent and purpose of the treaty. The allocation must also recognized the rights to non-Indian harvesters to their fair share in such resources. The Court will not address the allocation issue, however, until the proper showing has been made, as discussed in Section III, A, supra. The Bands are thus entitled to judgment on the allocation issues. The motion of the Counties and the Cross-motions of the Landowners are denied.

## IV. Counties' Motion to modify or clarify protective order

This motion will be denied.

*V. Landowners' motion to exclude declaration of Don Wedll and expert report of Harriet Kuhnlien*

The Landowners have moved the Court to exclude the expert report of Harriet Kuhnlien, which addresses the question whether the use of traditional Chippewa foods can improve the health and well-being of Band members, as being irrelevant, immaterial, lacking foundation, based upon hearsay and not upon personal knowledge. The expert report of Harriet Kuhnlien is relevant only to the determination of whether or not the Bands have achieved a moderate standard of living. As the Court finds such a determination is not necessary at this point, the Court will deny the motion without prejudice.

The Landowners also seek to exclude the declaration of Don Wedll, which was filed by the Bands in support of their motion for a preliminary injunction. However, as the Court need not address the motion for a preliminary injunction, the motion to exclude the declaration of Don Wedll is moot. Therefore, the motion is denied with prejudice.

*VI. Landowners' Motion to Strike Paragraph 4.12 of the Mille Lacs Band's Complaint*

The Landowners move the Court to strike Paragraph 4.12 of Mille Lacs Band's Complaint which reads:

> as result of the enforcement of defendants' natural resource laws and regulations, and threats of arrest, seizure and confiscation, the Band and its members have been prevented from or deterred in the exercise of their rights to harvest fish, game and other resources for subsistence, ceremonial, and cultural uses, and commerce as secured by the 1837 Treaty. As a result the Band has been deprived of an important source of subsistence resources and personal income, at a time when per capita income among Band members residing in or near the reservation is about $2,100.00 per year, unemployment is approximately 50%, and most Band households are in poverty.

The Landowners argue that the evidence that has been collected since the filing of the Complaint clearly establishes that these allegations are no longer true, if they ever were, due to the success of the Mille Lacs Band's casinos.

Rule 12(f) of the Federal Rules of Civil Procedure provides:

> Upon motion made by a party before responding to a pleading, or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

The Landowners assert that while Rule 12(f) typically requires a motion to strike be made within twenty days after service of a pleading, the Court has broad discretion to grant such motions regardless of time, citing to *Lunsford v. United States,* 570 F.2d 221 (8th Cir.1977).

While this Court has the discretion to grant a motion to strike at any time, such motions are nonetheless viewed with disfavor and are infrequently granted. *Lunsford,* 570 F.2d at 229. It should not be used to procure a dismissal of all or part of a Complaint. *Yamamoto v. Omiya,* 564 F.2d 1319, 1327 (9th Cir.1977); 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure: § 1380,* at 644 (1990). For purposes of deciding a Rule 12(f) motion, the Court must accept the facts alleged in Paragraph 4.12 of the Complaint as true. *Barnidge v. United States,* 101 F.2d 295 (1939). Accepting the facts as true, the Landowners cannot establish that Paragraph 4.12 contains assertions that are redundant, immaterial, impertinent or scandalous. Motion to strike is denied.

The Landowners have also filed a motion in limine to exclude portions of the expert report of Professor Daniel Bromley regarding Wisconsin property values. The expert report of Professor Bromley is relevant only to the allocation determination. As the Court finds such a determination is not necessary at this point, the Court will deny the motion without prejudice.

*VII. Landowners' Motion to Impose Liabilities on Band*

The Landowners also move for an order establishing 1) the Bands' liability on any and all claims arising from the Bands' and their members exercise of their usufructuary rights under the 1837 Treaty; 2) a compulsory insurance requirement for the Bands; and 3) a mandatory waiver of Band sovereign immunity and submission to state court adjudication as to such claims.

The Bands assert that this Court is without jurisdiction to decide this motion as it does not address an actual case or controversy. As stated earlier in this opinion, declaratory relief is only appropriate where there is an actual controversy. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). An actual controversy involves definite and concrete facts, not a dispute involving hypothetical situations. *Id.* at 240–241, 57 S.Ct. at 463–64. The Landowners do not present a controversy involving concrete or definite facts. Rather, it is only based on hypotheticals. Accordingly, the Court does not have jurisdiction to decide this motion.

*VIII. Landowners' Motions for Declaratory Judgment to Limit Exercise of Usufructuary Rights for Subsistence Purposes*

The Landowners assert that if the Court rules the Bands do not have an adequate remedy at law, and that the Bands will be allowed to exercise their usufructuary rights under the 1837 Treaty, the Bands should be limited to exercising such rights for their subsistence purposes only. *See,* Landowners Second and Third Motions for Summary Judgment. In *Mille Lacs II*, Judge Murphy has ruled "that the privilege granted in 1837 includes the right to harvest the resources for commercial purposes. Limits to this right because of resource allocation issues is a question for Phase II." 861 F.Supp. at 838. Thus, while the Landowners concede that the Bands treaty rights include commercial harvests, the Landowners nonetheless assert that the Bands' right to harvest the resources must be limited as they have achieved a moderate standard of living. Be-cause the Court has ruled allocation will not be addressed at this stage of the litigation, the Court will not address the issues raised in these motions.

## CONCLUSION

The Bands are entitled to summary judgment on all regulatory issues presented before the Court, with the exception of the definition of private lands. Accordingly, the Court finds that the legal standards that govern the State's regulations of treaty hunting, fishing and gathering place the burden on the State to establish its regulations are necessary for conservation, public health and safety, and that such regulations meet appropriate standards and do not discriminate. The burden does not shift to the Bands when the regulations involve a harvestable surplus determination. The Bands' treaty rights extend to all waters in and abutting the Ceded Territory. The exercise of usufructuary rights on private lands are limited to those private lands open to the public for hunting, fishing or gathering by operation of state law, such as the Minnesota tree growth tax law which creates a right of public access in exchange for granting of favorable tax treatment to lands. With respect to deer shining in December and gillnetting in lakes under 1,000 acres, the Court finds that the State has failed to meet its burden of establishing that the regulation of such harvest methods is necessary for purposes of conservation in light of the Bands' Conservation Code and Management Plans which place restrictions on these harvest methods. Finally, the Court will not make any allocation determination of resources at this time because there has been no showing of a need for allocation. Furthermore, the Court finds that it is inconsistent with applicable case law to prevent the Bands from exercising their rights, based on the argument that casino revenue provides the Bands with sufficient income. The treaty of 1837 reserved to the Bands the right to continue a way of life based on hunting, fishing and gathering. Because the 1837 Treaty preserves a way of life, not simply a means to make a living, the moderate standard of living doctrine cannot be applied to reduce the Bands' share of the

resources even before they are given a chance to harvest the resources.

IT IS HEREBY ORDERED:

1. The Stipulations are hereby approved, and the Court hereby makes the following FINDINGS and enters the following ORDERS consistent with the STIPULATIONS:

a. Upon adoption of the Band Code, including authorization of State of Minnesota Department of Natural Resources personnel to enforce the provisions of such Code, issuance of the Commissioner's Orders and approval of the Management Plans and Protocols attached as Exhibits A, B, C and D to the Stipulations, by one or more of the plaintiff or plaintiff-intervenor Bands, and enforcement of the same, the application to such Bands and their members of the State statutes and regulations listed in Exhibit E to the Stipulations as "Resolved", to the extent set forth in Exhibit E, will not be necessary for conservation, public health or safety as those terms were used by the Court in its Phase I decisions, and will therefore be unlawful.

b. The requirements of this order shall become effective immediately upon entry of the Court's final order in this case, and shall be binding on all parties, their successors in office, their agents, officers and representatives, and any and all persons claiming an interest through them.

c. If any Band fails to adopt a conforming conservation code, attempts to rescind or otherwise nullify its entire code, or substantially fails to enforce the provisions of its code, the members of that Band harvesting within the Minnesota 1837 Ceded Territory shall be subject to those state laws and regulations that meet the standards set forth in the Court's Phase I decision. The State may make objections to any changes in individual code provisions proposed by one or more of the Bands in the future in accordance with the procedures in the Protocols in Exhibit D to the Stipulation.

d. The State and the Bands shall fairly, uniformly and diligently enforce the conforming Band conservation codes adopted pursuant to this Court's final order, and their respective enforcement officers shall work cooperatively in doing so. In their respective enforcement activities, the Minnesota Department of Natural Resources shall make good faith efforts to coordinate with Band conservation wardens and Great Lakes Indian Fish and Wildlife Commission wardens duly appointed by a Band, and the Bands shall make good faith efforts to coordinate with State Department of Natural Resources Conservation Officers. The Bands and Great Lakes Indian Fish and Wildlife Commission Enforcement and Biological staffs shall share harvest, registration and similar data with the Minnesota Department of Natural Resources enforcement and biological personnel in a timely and professional manner in accordance with Protocol No. 4.

e. All records of tribal courts involving the exercise of treaty harvest rights shall be open for inspection and copying by the State Department of Natural Resources at reasonable times upon reasonable notice. The actual proceedings in said courts shall also be open to the State Department of Natural Resources. Any such records or proceedings that are protected by tribal law as confidential, such as juvenile records and proceedings, shall also be kept confidential by the State.

f. The Stipulating Parties shall comply with the terms and provisions of the Protocols set forth in Exhibit D to the Stipulations, including, without limitation, the procedures for resolving future disputes among those parties regarding the application of particular State statutes and regulations to Band members.

g. The Court will retain continuing jurisdiction over these cases to facilitate the implementation of the Court's orders and decrees herein, to resolve any disputes among the parties with respect thereto, or to address other matters as the Court may deem appropriate.

2. The Court grants summary judgment as follows:

a. MS 97A.045 is not reasonable and necessary for conservation as those terms are used in the Court's Phase I decisions and therefore cannot be applied to Band members exercising their treaty rights pursuant

to Band regulation, as provided in the Stipulations and their attachments. The State and the Bands shall attempt to reach consensus on harvestable surplus determinations in accordance with the Protocols attached to the Stipulations, but may seek resolution of disputes regarding such determinations from the Court on the terms and conditions set forth in the Protocols.

b. The Bands may exercise their treaty rights throughout the 1837 Ceded Territory in Minnesota, including the entirety of those lakes that are at least partially within the Ceded Territory. Harvestable surplus determinations shall not be reduced on the basis of the portion of a lake that is outside the Ceded Territory or the portion of a wildlife population that may be found on private lands absent a showing that such a reduction is necessary under the conservation necessity standard.

c. MS 97B.081, MS 97B.311, MR 6232.0300 and MR 6232.1300 are not reasonable and necessary for conservation as those terms are used in the Court's Phase I decisions and therefore cannot be applied to Band members exercising their treaty rights pursuant to Band regulation, as provided in the Stipulations and their attachments.

d. MS 97C.325, MS 97C.331 and MR 6262.0200 are not reasonable and necessary for conservation as those terms are used in the Court's Phase I decisions and therefore cannot be applied to Band members exercising their treaty rights pursuant to Band regulation, as provided in the Stipulation and its attachments.

3. The defendant and defendant-intervenors are entitled to summary judgment in their favor that the definition of "private lands" open to public hunting, fishing and gathering, excludes private lands not open to the general public without discrimination, by operation of state law. The defendant and defendant-intervenors are entitled to summary judgment in their favor on the issue of the inability of a landowner's consent to make otherwise private lands "private lands open to public hunting, fishing and gathering" for purposes of exercising treaty rights. The remaining motions for summary judgment by the defendant and defendant-inter-

venors on regulatory issues are DENIED in their entirety. The Bands' motion for summary judgment on the definition of private lands is DENIED.

4. The Court finds that all claims and defenses regarding the 1837 Treaty in these actions have been adjudicated. There are no other claims and defenses in *Mille Lacs Band v. State*, No. 3–94–1226, —— F.Supp. —— (D.Minn.1997) and the Clerk is directed to enter final judgment in that action in accordance with the opinions and orders of the Court. Although there are other claims (regarding the 1854 Treaty) in *Fond du Lac Band v. Carlson*, No. 5–92–159, the Court finds pursuant to Fed.R.Civ.P. 54(b) that there is no just reason for delay in entering judgment in that action on the claims and defenses arising under the 1837 Treaty, and the Clerk is directed to enter judgment on those claims and defenses in accordance with the opinions and orders of the Court. The State defendants in both actions, their officers, agents, servants, employees and attorneys, and anyone acting in concert with them, are permanently enjoined from any actions or inactions that would prevent or interfere with the exercise of the Bands' rights to hunt, fish and gather under the 1837 Treaty except as authorized in the opinions and orders of the court.

5. The Court GRANTS the plaintiffs' and plaintiff-intervenors' motion for summary judgment on allocation issues and DENIES the defendant and defendant-intervenors' request for an allocation of resources. Such denial is without prejudice to any party's right to bring new proceedings if it should appear that either treaty or non-treaty harvesters will be deprived in the future of a meaningful opportunity to harvest any resource.

6. The Counties' motion to modify or clarify the protective order of April 25, 1995 is DENIED.

7. The Landowners' motion to exclude the declaration of Don Wedll is DENIED.

8. The Landowners' motion to exclude the expert report of Harriet Kuhnlien is DENIED WITHOUT PREJUDICE.

9. The Landowners' motion to strike paragraph 4.12 of the Complaint is DENIED.

10. The Landowners' motion to exclude portions of the expert report of Daniel Bromley is DENIED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.